375 S.E.2d 549

Avis S. MOORE, etc.

v.

Sarah GOODE, Appellant Harry Morris, et al., Appellees.

No. 17299.

Supreme Court of Appeals of West Virginia.

Nov. 10, 1988.

A.L. Emch, Thomas Freeman, Jackson & Kelly, Charleston, for Avis S. Moore.

Benjamin N. Snyder, Charleston, for Goode.

Orton A. Jones, Hedges, Jones, Whittier & Hedges, Spencer, for Morris, et al.

MILLER, Justice:

Sarah Goode appeals from an order of the Circuit Court of Clay County granting a summary judgment against her in a proceeding to establish whether she is a beneficiary under the terms of the last will and testament of Custer Waldo Morris. On appeal, she asserts that the trial court erred in granting the summary judgment when the evidence was sufficient to allow the issue to go to a jury. We affirm the judgment of the circuit court.

I.

Custer Waldo Morris, a widower without issue, died on September 13, 1981. He was seventy-six years old. His last will and testament gave all his property, real and personal, in equal shares, to his surviving brothers and sisters. On September 14, 1981, Avis S. Moore, the executrix of the will and the County Clerk of Clay County, listed as the beneficiaries Harry Morris, Goldie I. Douglas, Merle Rogers, Hallie Talley, and Ruie Robertson. They are the surviving brother and sisters of Mr. Morris, born to Isaac N. Morris in lawful wedlock.

Approximately one year later, Sarah Goode claimed to be a half-blood sister of the decedent and entitled to share in his estate. She alleged that she had been born out of wedlock to the late Isaac N. Morris, the father of Custer Waldo Morris. Ms. Moore, as executrix, instituted this action for a determination of the beneficiaries under the will. Sarah Goode filed a counterclaim against Ms. Moore and cross-claimed. The codefendants are the listed beneficiaries (hereinafter referred to as "beneficiaries") who were acknowledged to be the real parties in interest. Depositions were taken and various documents produced by the parties.

In October, 1983, the parties submitted stipulations and exhibits to the court and requested a preliminary determination of two legal issues: (1) who has the burden of going forward with the evidence and the burden of proof with respect to the paternity of Sarah Goode, and (2) what is the standard of proof with respect to that is-

sue. A third issue was whether the relevant and admissible evidence as represented by the stipulations, including the depositions, would be sufficient to prove that Sarah Goode is the daughter of Isaac N. Morris.

The court after due consideration entered an order on June 27, 1984, that Sarah Goode had the burden of proof with respect to her paternity, that she must establish it by clear and convincing evidence, and that the relevant and admissible evidence submitted to the court would not be sufficient as a matter of law to establish paternity.

On the day this case was called for trial, May 6, 1985, counsel for Sarah Goode announced that she had no additional evidence. The beneficiaries moved the court for summary judgment upon all the pleadings, papers, deposed testimony, stipulations, and affidavits that had been filed in the action. The court granted the summary judgment, holding that Ms. Goode was not a sibling of Custer Waldo Morris and, therefore, was not a member of the class taking under his last will and testament.

## II.

Despite the appellant's assertion that the circuit court should not have granted summary judgment, we do not view this case as one decided on that basis. It is clear that on the day of trial the appellant had concluded that all of the relevant evidence had been developed through discovery and evidentiary depositions, documents, and a factual stipulation. The appellant elected to submit the matter to the court for a final decision. This decision was taken with full

knowledge of the court's preliminary ruling of June 27, 1974.

■ Viewing the record as a whole, it is clear that the parties submitted the case to the judge to decide the matter without a jury, as authorized by Rule 52(a) of the West Virginia Rules of Civil Procedure. Under this rule when the court makes its findings of fact and conclusions of law, as was done here, the judgment is given the same weight as a jury verdict. *Nationwide Mut. Ins. Co. v. Conley*, 156 W.Va. 391, 194 S.E.2d 170 (1972). The weight accorded to such fact findings on appeal is succinctly stated in Syllabus Point 1 of *McDaniel v. Romano*, 155 W.Va. 875, 190 S.E.2d 8 (1972):

"Findings of fact by a trial court without a jury will not be set aside unless they are clearly wrong."

■ Thus, we reject the appellant's argument that summary judgment rules apply to this case. Consequently, we proceed to review the various rulings made by the trial court to determine if they were clearly wrong.

## III.

As the parties have framed the case, Ms. Goode's paternity is determinative of all the issues between the parties. Custer Waldo Morris, the testator, left a will in which the beneficiaries were his brother and sisters.[1]

■ Ms. Goode claims as a child born out of wedlock. In *Adkins v. McEldowney*, 167 W.Va. 469, 280 S.E.2d 231 (1981), we extended such a person's right to inherit from his natural father by establishing an equal protection component to W.Va.Code, 42–1–5,[2] stating in Syllabus Point 3:

---

1. A substantial question also arises as to whether he intended to have Ms. Goode inherit as a half-sister born out of wedlock even if she could establish paternity. This issue involves ascertaining the testator's intent to include such a person under the phrase "brothers and sisters." The evidence suggests that at no time prior to his death did Custer Waldo Morris believe that he had a half-sister. *See Baker v. Giffrow*, 257 Iowa 929, 135 N.W.2d 629 (1965); *National City Bank of Cleveland v. Judkins*, 8 Ohio Misc. 119, 219 N.E.2d 456 (Ohio Com.Pl.1964).

2. W.Va.Code, 42–1–5 (1923), provides: "Bastards shall be capable of inheriting and transmitting inheritance on the part of their mother, as if lawfully begotten." Through the years, various appellations have been used to describe this class of individuals. Initially the term used in this statute was thought fitting. This was superseded by "illegitimate children," and this has largely been supplanted by the term "children born out of wedlock." 6 Ninth Decennial Digest (Part 2) Table I. *See Matter of Legitimation of Locklear by Jones*, 314 N.C. 412, 334 S.E.2d 46 (1985).

"Our legislature has manifested its intent to abrogate common law prohibitions against inheritance by [children born out of wedlock], and has given them rights of inheritance from and through their mothers. This, however, creates an impermissible discrimination that we, applying the doctrine of neutral extension, must remedy by requiring that Code, 42–1–5 be applied to permit [children born out of wedlock] to inherit from both mother and father."

This decision was mandated by *Trimble v. Gordon*, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977), where the United States Supreme Court held that equal protection under the United States Constitution requires that a statute not deny to a person born out of wedlock intestacy rights in his or her father's estate.[3] *See also Williamson v. Gane*, 176 W.Va. 443, 345 S.E.2d 318 (1986).

The circuit court found that Ms. Goode must establish her paternity by clear and convincing evidence. This was the statutory standard for a paternity suit at the time of trial. W.Va.Code, 48–7–4(c) (1983).[4] This same standard has been carried into W.Va.Code, 48A–6–4 (1986).[5] This section is a part of the Enforcement of Family Obligations Act, W.Va.Code, 48A–1–1, *et seq.* (1986), which supplanted W.Va.Code, 48–7–1, *et seq.* (1983).

This statutory standard of clear and convincing evidence changes the court formulated rule developed in *State ex rel. Toryak v. Spagnuolo*, 170 W.Va. 234, 292 S.E.2d 654 (1982), which was decided under an older version of W.Va.Code, 48–7–1. This earlier statute was quasi-criminal and provided no standard of proof. W.Va.Code, 48–7–4 (1969). In *Toryak*, we held that proof beyond a reasonable doubt was required. Obviously, the legislative enactment of a clear and convincing proof standard to establish paternity in W.Va.Code, 48–7–4(c) (1983), and carried into W.Va. Code, 48A–6–4 (1986), overrules the proof beyond a reasonable doubt standard set out in *Toryak*.[6]

We have defined what is meant by clear and convincing evidence in *Wheeling Dollar Savings & Trust Co. v. Singer*, 162 W.Va. 502, 510, 250 S.E.2d 369, 374 (1978):

"[It] is the highest possible standard of civil proof defined as 'that measure or

---

3. The United States Supreme Court has considered the rights of children born out of wedlock in a variety of different contexts to determine if there has been a violation of equal protection principles. *E.g., Clark v. Jeter*, 486 U.S. 456, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (six year statute of limitations for paternity suits invalid); *Matthews v. Lucas*, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976) (upheld Social Security Act provisions on child born out of wedlock); *Weber v. Aetna Casualty & Sur. Co.*, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) (invalidated workers' compensation statute excluding claims for children born out of wedlock); *Glona v. American Guarantee & Liab. Ins. Co.*, 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968) (wrongful death statute barring children born out of wedlock).

4. W.Va.Code, 48–7–4(c) (1983), provides in pertinent part:

"If the defendant, by verified responsive pleading shall admit that he owes a duty of support, or if after a trial on the merits, the court or jury shall find, by clear and convincing evidence that the defendant is the father of the child, the court shall order the defendant to provide support in accordance with the provisions of subsection (d), section three [§ 48–7–3(d) ] of this article."

5. W.Va.Code, 48A–6–4 (1986), states:

"If the defendant, by verified responsive pleading shall admit that he is the father of the child and owes a duty of support, or if after a trial on the merits, the court or jury shall find, by clear and convincing evidence that the defendant is the father of the child, the court shall order the defendant to provide support in accordance with the provisions of this chapter."

6. The single Syllabus of *Toryak* stated:

"In a proceeding upon a bastardy charge under *W.Va.Code*, 48–7–1, *et seq.*, the paternity of the child, if contested, is an essential element of the charge, and must be proved beyond a reasonable doubt."

Recently in *Rivera v. Minnich*, 483 U.S. 574, 107 S.Ct. 3001, 97 L.Ed.2d 473 (1987), the Supreme Court held that a paternity statute which provided proof by a preponderance of evidence did not violate the due process clause of the Fourteenth Amendment to the United States Constitution. It concluded that the clear and convincing standard of proof for terminating a parent-child relationship established in *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), was not applicable.

degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.' *Cross v. Ledford,* 161 Ohio St. 469 at 477, 120 N.E.2d 118 at 123 (1954). *See also Fred C. Walker Agency, Inc. v. Lucas,* 215 Va. 535, 211 S.E.2d 88 (1975)."

■ We recognize that this suit is not a paternity action because Isaac N. Morris is deceased. However, there appears no good reason why this same standard should not apply to the present case. Other courts have fashioned an analogous standard in cases involving children born out of wedlock trying to establish a claim based on proof of paternity. *Cotton v. Terry,* 495 So.2d 1077 (Ala.1986); *Ivy v. Illinois Cent. Gulf R. Co.,* 510 So.2d 520 (Miss.1987); *Sondra S. v. Jay O.,* 126 Misc.2d 322, 482 N.Y.S.2d 660 (1984); *In Re Estate of Cherkas,* 506 A.2d 1029 (R.I.1986); Uniform Probate Code § 2–109, 8 Uniform Laws Annot. 67 (1983).

### IV.

In *Adkins* we suggested that "[o]ur legislature may want to provide a statutory scheme compatible with our holding today, outlining how illegitimate children may prove entitlement to inherit from their fathers." 167 W.Va. at 473, 280 S.E.2d at 233. *See generally, Lalli v. Lalli,* 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978); *Trimble v. Gordon, supra; Labine v. Vin-*

*cent,* 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971). We went on to state in *Adkins* that in the absence of any statutory standard, the trial courts would have to resolve the matter on a case by case basis.

■ The codefendants urge us to adopt the "determined father" definition as contained in W.Va.Code, 48–4–1(a) (1976),[7] which is a part of our adoption statute. We decline to hold that the legislature intended the determined father language in the adoption statute to be the means by which paternity is established for purpose of intestate succession.

If anything, it would appear that the determined father definition is designed to separate him from the category of "unknown father" who is also the biological father. W.Va.Code, 48–4–1(c) (1985). This is done to follow the statutory adoption plan which requires consent from the "determined father", but not the "unknown father." These statutory distinctions may have evolved in order to meet the due process and equal protection problems that can occur in adoption cases. *See Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511, *reh. den.* 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511 (1978); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).[8]

Finally, we would observe that the determined father statutory definition is basically limited to those situations where the father's paternity has been established dur-

---

**7.** W.Va.Code, 48–4–1(a) (1976), states:
"[A] 'determined father' means any person who:
"(1) Has been found guilty under the provisions of article seven, chapter forty-eight of this Code (the aforesaid paternity statute); or
"(2) Has acknowledged his parental status by contributing to the child's support, by living with the mother, at the time of conception, or by admitting paternity by any means."
Prior to the trial of this case, effective on June 10, 1984, this section was amended. 1984 W.Va. Acts ch. 3. W.Va.Code, 48–4–1(b) (1984), provided:
"A 'determined father" is, before adoption, a person (1) adjudicated to be the father of a

child under the provisions of article seven of this chapter; or (2) who makes an affidavit stating that he is the father of a child and who is identified as the father by the mother in a like affidavit; or (3) who has, at his instance, been otherwise judicially determined to be the biological father of the child entitled to parental rights with respect to the child[.]"
A 1985 amendment to W.Va.Code, 48–4–1(b) (1985), added: "or (4) who claims to be the father of the child." 1985 W.Va.Acts ch. 3.

**8.** In commenting on the adoption statute, we do not judge its merits since this is not an issue in the present case.

ing his lifetime. This would obviously exclude cases like the present one where the inheritance rights come into play after the putative father's death. While the United States Supreme Court has recognized in *Reed v. Campbell*, 476 U.S. 852, 106 S.Ct. 2234, 90 L.Ed.2d 858, *reh. denied*, 478 U.S. 1031, 107 S.Ct. 11, 92 L.Ed.2d 766 (1986), that the state may impose some statutory restrictions on the right of a child born out of wedlock to inherit from her father,[9] they cannot be unjustifiably discriminatory.

"The state interest in the orderly disposition of decedents' estates may justify the imposition of special requirements upon an illegitimate child who asserts a right to inherit from her father, and, of course, it justifies the enforcement of generally applicable limitations on the time and the manner in which claims may be asserted. After an estate has been finally distributed, the interest in finality may provide an additional, valid justification for barring the belated assertion of claims, even though they may be meritorious...." 476 U.S. at 855, 106 S.Ct. at 2237, 90 L.Ed.2d at 863.

In *Reed,* the child sought to claim a share of his father's estate some eighteen years after he was born and two years after his father had died intestate. The putative father died and the child's claim was filed before *Trimble v. Gordon, supra,* was decided. The Texas court held that *Trimble* was not retroactive and, therefore, its principle was not applicable to the case. This was rejected by a unanimous Supreme Court which concluded:

"The interest in equal treatment protected by the Fourteenth Amendment to the Constitution—more specifically, the interest in avoiding unjustified discrimination against children born out of wedlock, see *Mathews v. Lucas*, 427 U.S. 495, 505, 49 L.Ed.2d 651, 96 S.Ct. 2755, 2762

(1976)—should therefore have been given controlling effect. That interest requires that appellant's claim to a share in her father's estate be protected by the full applicability of Trimble to her claim." (Footnote omitted.) 476 U.S. at 856, 106 S.Ct. at 2238, 90 L.Ed.2d at 863.

Thus, in the absence of any relevant statute on this subject, we are left with a case-to-case analysis as indicated in *Adkins*.

### V.

A number of evidentiary rulings were made which require our consideration.

### A.

The record does not include any documentation or testimony that during his lifetime Isaac N. Morris ever acknowledged Sarah Goode as his daughter. He paid no support for her to Vesta Bishop, Sarah Goode's mother. The record does contain documents reflecting that Vesta Bishop instituted a paternity suit in 1936 in a Justice of the Peace Court of Clay County alleging that Isaac N. Morris was the father of Sarah Goode.

These documents consisted of the complaint and warrant on the original paternity charge made by Vesta Bishop and also the bond posted by Isaac N. Morris. The court held that these documents were admissible as official records of the justice of the peace court.

Under the procedure existing in 1936, the initial complaint was made before a justice of the peace, who issued a warrant to have the putative father brought before him. Upon his appearance, he was required to execute a bond to secure his attendance at further proceedings which were held in the circuit court. W.Va.Code, 48–7–1 (1931).

---

9. We acknowledge the Supreme Court's plurality opinion in *Lalli v. Lalli, supra,* which involved a New York statute that foreclosed a child born out of wedlock from inheriting from a father unless paternity had been judicially established before his death. However, we are reluctant to impose such a limitation in the absence of any legislative enactment. The status of *Lalli* is itself confusing since Justice Blackman, in a separate concurrence which provided the fifth vote to uphold the New York statute, stated he would overrule *Trimble v. Gordon, supra. Trimble* is the cornerstone of the equal protection theory in out of wedlock paternity inheritance cases. Justice Blackman's concurrence in *Lalli* seems at odds with his joining the more recent unanimous opinion of *Reed,* which reinforced *Trimble.*

We allowed the introduction of a similar complaint affidavit in *Farley v. Farley*, 136 W.Va. 598, 68 S.E.2d 353 (1951), stating only that "such paper was a part of the proceeding before the justice [of the peace]." 136 W.Va. at 607, 68 S.E.2d at 359. However, it is doubtful that pleadings, even if verified, can be used to prove the truth of the matter asserted as against a third party. *See* McCormick on Evidence § 317 (3rd ed.1984). The trial court in this case determined that, at best, the documents were nothing but an assertion of paternity.

■ We spoke to the question of statements made in pleadings in *Lotz v. Atamaniuk*, 172 W.Va. 116, 120, 304 S.E.2d 20, 24 (1983), terming them "judicial admissions", citing 29 Am.Jur.2d *Evidence* §§ 597 and 614, and said that "[a]lthough they are not conclusive in a subsequent proceeding between the same parties (or as here, their representatives), they are admissible and may be given whatever weight the trier of fact deems appropriate." It is clear, however, that the theory by which such admissions are received is that they are made *against* the pleader. McCormick on Evidence § 265 (3rd ed.1984)); F. Cleckley, Handbook on Evidence for West Virginia Lawyers § 8.5(c) at 471–74 (2d ed.1986). Here, there was nothing filed by Isaac N. Morris that constituted any admission of paternity. Consequently, we believe the complaint and the appearance bond cannot be considered as evidence.

### B.

■ The trial court refused the entry from the justice of the peace court showing that Isaac N. Morris had been found guilty. This was done on the basis that under W.Va.Code, 48–7–1, the justice of the peace lacked jurisdiction as the paternity issue had to be tried in the circuit court. *Farley v. Farley, supra; Holmes v. Clegg*, 131 W.Va. 449, 48 S.E.2d 438 (1948). We find this ruling to be correct as a judgment from a court lacking subject-matter jurisdiction is a nullity. Syllabus Point 5, *Rakes v. Ferguson*, 147 W.Va. 660, 130 S.E.2d 102 (1963); *Cobb v. Cobb*, 145 W.Va. 107, 113 S.E.2d 193 (1960). Consequently, it cannot be admitted into evidence to prove the facts contained therein.

■ The order of the Circuit Court of Clay County dated June 9, 1938, showing that the paternity suit was compromised, would also not be admissible simply because it was not an adjudication of paternity. Consequently, we need not determine its admissibility had there been an adjudication on the merits in circuit court.[10]

### C.

Another document identified as C–1 was a typed compromise agreement which referred to the paternity suit between Vesta Bishop and Isaac N. Morris. It indicated that for the payment of $50.00 the suit would be dismissed. The date above the signature line was March 29, 1938, but it was not signed. There was an affidavit given by a Vergie Morris which stated that she had found this among the possessions of Custer Waldo Morris in July, 1982 after his death. She was his sister-in-law. The

---

**10.** McCormick on Evidence § 318 at 893–94 (3rd ed. 1984) gives this summary of the evidentiary rule:

"[I]t would seem that the judgment of a court, made after the full investigation of a trial, would also be admissible in subsequent litigation to prove the truth of those things necessarily determined in the first action. Guilty pleas and statements made in the course of litigation may constitute declarations against interest or admissions of a party-opponent and under those exceptions avoid the bar of the hearsay rule. Where the doctrines of res judicata or collateral estoppel, or in modern terminology claim preclusion or issue preclusion, make the determinations in the first case binding in the second, of course, the judgment in the first case is not only admissible in the second, but it is as a matter of substantive law conclusive against the party. If neither res judicata nor collateral estoppel applies, however, the courts have traditionally been unwilling to admit judgments in previous cases. The judgments have been regarded as hearsay and not within any exception to the hearsay rule." (Footnotes omitted).

We note that Rule 803(22) of the West Virginia Rules of Evidence relates to the hearsay exception for "judgment of previous convictions," but again there was no conviction in the earlier paternity suit assuming it met the criminal test.

trial court believed this document to be admissible as an ancient document, but we hold otherwise.

There is some confusion surrounding the ancient document rule at common law. Several commentators suggest that it was primarily a rule to enable authentication of a document. *See* 4 J. Weinstein and M. Berger, Weinstein's Evidence ¶ 803(16)[01] (1987); McCormick on Evidence § 323 at 903–05 (3d ed.1984). However, McCormick also notes that "[n]early all courts will apply the hearsay exception to recitals in an ancient deed ... [to prove] heirship and of consideration ... especially where possession is taken under the deed." *Id.* at 904. *See, e.g., Furbee v. Underwood,* 107 W.Va. 85, 147 S.E. 472 (1929); *Webb v. Ritter,* 60 W.Va. 193, 54 S.E. 484 (1906); *Wilson v. Braden,* 56 W.Va. 372, 49 S.E. 409 (1904). Both Weinstein and McCormick offer some of the same reasons to support the ancient document exception to the hearsay rule, *i.e.,* (1) dangers of mistransmission will be minimal since the rule only applies to written documents; (2) the age requirement assures that the recitals will have occurred before the present controversy—hence there is little motive to falsify; (3) recitals are more reliable than a declarant's oral testimony based on his memory of the distant event; and (4) reliability is enhanced if the declarant has actual firsthand knowledge of the facts asserted.

There is little question that, whatever its common law status, the ancient documents exception has been broadened under our Rules of Evidence. The admissibility of recitals in ancient deeds is covered in Rule 803(15). The remainder of the ancient document rule is contained in Rule 803(16), which provides: "Statements in a document in existence twenty years or more the authenticity of which is established" are admissible. However, this rule carries the qualification that the document itself or its contents not be suspicious with regard to

its genuineness and reliability. *Stewart Oil Co. v. SOHIO Petroleum Co.,* 315 F.2d 759 (7th Cir.), *cert. denied,* 375 U.S. 828, 84 S.Ct. 71, 11 L.Ed.2d 60 (1963); *Town of Ninety-six v. Southern Ry. Co.,* 267 F.2d 579 (4th Cir.1959); *In Re Hall's Estate,* 466 F.2d 340 (D.C.Cir.1972); *Russell v. Emerson,* 108 N.H. 518, 240 A.2d 52 (1968); *Budlong v. Budlong,* 48 R.I. 144, 136 A. 308 (1927); *Muehrcke v. Behrens,* 43 Wis.2d 1, 169 N.W.2d 86 (1969); *see generally,* 29 Am.Jur.2d *Evidence* § 357 (1967); F. Cleckley, *supra* at 533–34.

■ We do not believe that the document in question can qualify as an ancient document. The threshold question as to its authenticity raises suspicions. First, the document is not signed nor is there any evidence that it had ever been signed. Moreover, the content of the document is not a recital of facts that may be assumed to have been true at the time the document was made. Instead, the document purports to compromise a lawsuit which involved disputed facts about the paternity of a child. There is nothing in this document that indicates Isaac N. Morris acknowledged paternity, and nothing to show by way of signature that he acceded to it. We decline to accept it as within the ancient document hearsay exception.

### D.

■ Other documents were also considered by the trial court. Exhibit D–1, the original birth certificate of Sarah Goode, was admitted under the vital statistics exception to the hearsay rule. This is contained in Rule 803(9).[11] This rule ordinarily pertains to those facts or events contained in a report which a public official had a duty to record. *See generally,* McCormick on Evidence § 317 at 892–93 (3d ed.1984); F. Cleckley, *supra* at 529. We also have statutes which bear upon the vital statistics rule.[12] Under W.Va.Code, 16–5–27(b) "[a]

---

11. Rule 803(9) provides: *"Records of Vital Statistics.*—Records or data compilations, in any form, of births, fetal deaths, deaths, or marriages, if the report thereof was made to a public office pursuant to requirements of law."

12. W.Va.Code, 16–5–1, *et seq.* (1969), is entitled "Vital Statistics," and under Section 1j this term is defined as "records of birth, death, fetal death, marriage, divorce, annulment and data related thereto."

certified copy of a certificate [issued by the state registrar of vital statistics] or any part thereof ... shall be considered for all purposes the same as the original, and shall be prima facie evidence of the facts therein stated." [13]

In *Dorsey v. Prudential Ins. Co. of America*, 124 W.Va. 100, 19 S.E.2d 152 (1942), we considered the forerunner to the above quoted section and made this statement in Syllabus Point 1:

"Under the provisions of Chapter 32, Acts 1939, a properly certified copy of a death certificate is prima facie evidence only of such facts as are stated therein without contradiction or equivocation."

*Dorsey* involved a claim for double indemnity benefits where the death certificate stated the individual died from peritonitis from a ruptured duodenal ulcer. It also contained some equivocal statements that indicated the rupture might have occurred while lifting boxes. The court concluded these statements were too contradictory to be given prima facie effect.

In this case, there were two birth certificates offered. The first was the original, showing the mother to be Vesta Bishop, the father's name "not given," and no name listed for the child. This was filed on May 16, 1936, giving a birthdate of April 1, 1936. A subsequent birth certificate showing a file date of September 13, 1940, and a year earlier birth date of April 1, 1935, was also tendered. It did not contain the names of either the mother or father, but listed the child's name as "Sara Lou Morris."

We note that the birth certificate statute, W.Va.Code, 16-5-12(e), contains a legislative policy not to identify the name of the father if the mother is not married, unless his written consent is obtained or paternity has been determined by a court of competent jurisdiction.[14] In the absence of a showing in the record of either of these two conditions, we do not believe the name "Morris" on the second birth certificate can be given any evidentiary weight. The first birth certificate contains no facts that link the child to Isaac N. Morris.

A final exhibit is the marriage license of Sarah Lou Shamblin and Homer Goode, dated December 1, 1953. In the application, "Isaac Morris and Vesta Shamblin" are listed as her parents. Again, we believe the legislative policy against identifying a putative father in vital statistics records, unless he consents, or has been judicially determined to be the parent, precludes utilization of this information.

13. The complete text of W.Va.Code, 16-5-27(a) and (b) (1969), is:

"In accordance with section twenty-five [§ 16-5-25] of this article and the rules and regulations adopted pursuant thereto:

"a. The state registrar of vital statistics shall upon request issue a certified copy of all or any part of any certificate or record in his custody. Each copy issued shall show the date of registration, and copies issued from records marked 'delayed,' 'amended,' or 'court order' shall be similarly marked and shall show the effective date of the delayed registration, amendment or court order.

"b. A certified copy of a certificate or any part thereof, issued in accordance with subdivision a of this section, shall be considered for all purposes the same as the original, and shall be prima facie evidence of the facts therein stated."

W.Va.Code, 16-5-25 (1969), referred to above, deals again with authentication and states:

"To preserve original documents, the state registrar of vital statistics is hereby authorized to prepare typewritten, photographic, or other reproductions of original records and files in his office. Such reproductions when certified by him shall be accepted as the original record."

14. W.Va.Code, 16-5-12(e) (1979), provides:

"If the mother was not married either at the time of conception or birth, the name of the father shall not be entered on the certificate of birth without the written consent of the mother and of the person to be named as the father unless a determination of paternity has been made by a court of competent jurisdiction, in which case the name of the father as determined by the court shall be entered."

The forerunner, W.Va.Code, 16-5-14(h) (1931), contained a similar provision:

"That if the child is illegitimate, the name or residence of, or other identifying details relating to the putative father, shall not be entered without his consent: Provided further, that whenever a judgment has been entered determining the paternity of an illegitimate child, the clerk of the court where entered shall report the facts to the state registrar, who shall record the name of the father."

### E.

Other key evidentiary rulings were with regard to depositions offered by Sarah Goode to support her paternity claim. The court rejected deposition testimony of her mother, Vesta Bishop Shamblin, as well as the deposition testimony of Sarah Goode and James Douglas, her former attorney. Mrs. Shamblin stated that Isaac N. Morris was the father of Sarah Goode. The testimony of Sarah Goode was rejected as hearsay since she stated her mother had told her that Isaac N. Morris was her father. Mr. Douglas' testimony to the effect that Custer Waldo Emerson had told him that Mr. Morris admitted paternity and that he had arranged a settlement of the paternity suit for his father. Both the mother's and Douglas' testimony was rejected under the Dead Man's Act, W.Va.Code, 57–3–1.

The Dead Man's Act, W.Va.Code, 57–3–1, states that no "party ... or interested person [who] derives any interest or title ... shall be examined as a witness in regard to any personal transaction or communication between such witness and a person [who] at the time of such examination [is] deceased...." [15]

■ Initially it should be remembered, as our earlier cases have stated, that this statute was designed to alleviate the harsh common law rule that foreclosed any witness who had an interest in the suit from testifying. *E.g., In re: Fox' Estate*, 131 W.Va. 429, 48 S.E.2d 1 (1948); *Charleston Nat'l Bank v. Hulme*, 117 W.Va. 790, 188 S.E. 225 (1936); *Board of Educ. v. Harvey*, 70 W.Va. 480, 74 S.E. 507 (1912); *Crothers' Adm'rs v. Crothers*, 40 W.Va. 169, 20 S.E. 927 (1895).[16] As McCormick observes, the common law rule was ameliorated by removing the disqualification except where one of the parties to the transaction had died or become insane, in which event the possibility of fraudulent testimony from the surviving witness was of concern:

> "In this country, however, a compromise was forced upon reformers. The objection was raised that in controversies over contracts or other transactions where one party to the transaction had died and the other survived, hardship and fraud would result if the surviving parties or interested persons were permitted to testify to the transactions. The survivor could testify though the adverse party's lips would be sealed in death." [17]

We spoke to the potential for fraud and undue advantage in *Miami Coal Co., Inc. v. Hudson*, 175 W.Va. 153, 159, 332 S.E.2d 114, 119 (1985): "[T]he decedent is unable to confront the survivor, give his version of the affair, and expose the possible omissions, mistakes or perhaps even outright falsehoods of the survivor." *See generally*, F. Cleckley, *supra* at 40–44.

It is important to keep in mind the framework of the Dead Man's statute. By express terms, it applies only to a "civil action, suit or proceeding." The statute begins with a broad testimonial grant: "No person offered as a witness ... shall be

---

**15.** The full text of W.Va.Code, 57–3–1 (1937), is:

"No person offered as a witness in any civil action, suit or proceeding, shall be excluded by reason of his interest in the event of the action, suit or proceeding, or because he is a party thereto, except as follows: No party to any action, suit or proceeding, nor any person interested in the event thereof, nor any person from, through or under whom any such party or interested person derives any interest or title by assignment or otherwise, shall be examined as a witness in regard to any personal transaction or communication between such witness and a person at the time of such examination, deceased, insane or lunatic, against the executor, administrator, heir at law, next of kin, assignee, legatee, devisee or survivor of such person, or the assignee or committee of such insane person or lunatic.

But this prohibition shall not extend to any transaction or communication as to which any such executor, administrator, heir at law, next of kin, assignee, legatee, devisee, survivor or committee shall be examined on his own behalf, nor as to which the testimony of such deceased person or lunatic shall be given in evidence...."

**16.** McCormick on Evidence § 65 at 159 (3d ed. 1984), summarizes the common law: "By far the most drastic of the common law rules of incompetency was the rule that excluded the testimony of the parties to the lawsuit and of all persons having a direct pecuniary or proprietary interest in the outcome."

**17.** McCormick on Evidence § 65 at 159 (3d ed. 1984).

excluded by reason of his interest in the event of the action, suit or proceeding, or because he is a party thereto...." This is followed by an exception that narrows the scope of testimonial qualification, but it requires the concurrence of three conditions in order to bar the testimony:

(1) A witness' testimony is excluded if it relates to a personal transaction or communication with the deceased, insane or lunatic person,[18] and

(2) The witness is either a party to the suit or a person interested in its event or is a person through or under whom such party or interested person derives any interest or title by assignment,[19] and

(3) The testimony offered must be against the executor, administrator, heir at law, next of kin, assignee, legatee, devisee or survivor of such [deceased] person or the assignee or committee of such insane person or lunatic.[20]

Thus, to summarize the basic operation of the Dead Man's Act, a concurrence of three general conditions must be met in order to bar the witness's testimony. First, the testimony must relate to a personal transaction with a deceased or insane person. Second, the witness must be a party to the suit or interested in its event or outcome. Third, the testimony must be against the deceased's personal representative, heir at law, or beneficiaries or the assignee or committee of an insane person.[21] *See generally*, F. Cleckley, *supra* at 40–44.

As to the testimony of Mrs. Shamblin, Sarah Goode's mother, relating to Isaac N. Morris' paternity of Sarah Goode, we do not believe it is barred by the Dead Man's Act. She was not a party to the litigation against the estate of Custer Waldo Morris. It is clear that having a family relationship to a party to the litigation will not in itself disqualify the witness. *Woodrum v. Price*, 104 W.Va. 382, 140 S.E. 346 (1927); *Hollen v. Crim*, 62 W.Va. 451, 59 S.E. 172 (1907). Thus, Sarah Goode's mother was not disqualified because of her relationship to Sarah.

We dealt with a somewhat related problem in *Pickens v. O'Hara*, 120 W.Va. 751, 200 S.E. 746 (1938), where several plaintiffs sought to inherit under the will of W.E. Arnold which had created a trust in favor of the children of his son. The plaintiffs were children of his son's common law wife.[22] The central issue in *Pickens* was whether the common law wife's testimony with regard to her relationship with the

**18.** Personal transactions and communication with a deceased or insane person have been broadly defined to include "every method whereby one person may derive impressions or information from the conduct, condition, or language of another." Syllabus Point 5 in part, *Freeman v. Freeman*, 71 W.Va. 303, 76 S.E. 657 (1912). *See also Kuhn v. Shreeve*, 141 W.Va. 170, 177, 89 S.E.2d 685, 691 (1955).

**19.** A party to the action is excluded and also any interested person. As to who is an interested person, in *Coleman v. Wallace*, 143 W.Va. 669, 672, 104 S.E.2d 349, 351 (1958), this statement was made: "Such person must have an interest to be affected by the result of the suit or the force of the adjudication." Furthermore, "it must be a present, certain and vested interest; not uncertain, remote, or contingent." *Lilly v. Ellison*, 107 W.Va. 402, 405–06, 148 S.E. 380, 381 (1929).

**20.** *E.g., Board of Educ. v. Harvey, supra; Shuman v. Shuman*, 79 W.Va. 445, 91 S.E. 264 (1917).

**21.** It should be noted that the Dead Man's Act does not preclude the members of the protected class from testifying and if they testify as to the deceased's transaction, then there is a waiver of the statutory bar as to the other side. *In re Estate of Thacker*, 152 W.Va. 455, 164 S.E.2d 301 (1968). The statute also provides that in a wrongful death action "the person sued or the servant, agent or employee of any firm or corporation sued, shall have the right to give evidence in any case ... but he may not give evidence of any conversation with the deceased." This provision was apparently made in 1937 to counter the rule announced in *Strode v. Dyer*, 115 W.Va. 733, 177 S.E. 878 (1934), and followed in *Willhide v. Biggs*, 118 W.Va. 160, 188 S.E. 876 (1936). A final point is that the bar of the Dead Man's Act may be waived if a timely objection is not made to the improper testimony. *First Nat'l Bank of Ronceverte v. Bell*, 158 W.Va. 827, 215 S.E.2d 642 (1975).

**22.** The Court recognized in *Pickens* that by virtue of W.Va.Code, 42–1–7 (1931), children born of a common law marriage were deemed legitimate. This statute provides: "The issue of marriages deemed null in law, or dissolved by a court, shall nevertheless be legitimate."

son, who was dead, was admissible under the Dead Man's statute. The Court, without a great deal of discussion, found that the testimony was not banned as the suit was not against the son's estate but his father's. The personal transaction was to establish paternity to the son which did not involve a communication against the deceased father.

First, as previously noted, she was not a party and was not an interested person under the statute. Moreover, her testimony was not a personal transaction or communication against Custer Waldo Morris, deceased, since it related to his father. One of the practical evidentiary tests involved to determine if the evidence constitutes a personal transaction is stated in *Kuhn v. Shreeve*, 141 W.Va. at 177, 89 S.E.2d at 690:

"The test generally accepted is to the effect that if a deceased were alive and testifying, or an insane person were sane and testifying, could the testimony of a witness testifying in opposition to a transaction or communication be disputed by the testimony of the absent witness."

If the deceased, Custer Waldo Morris, were alive, he would not be able to refute the testimony of Mrs. Shamblin as to her communications with his father since he was not present when these occurred.

The question of excluding the testimony of Sarah Goode concerning statements by Mr. Douglas, her former attorney, centered on the fact that he had retained a pecuniary interest by way of fees for services rendered. It appears Mr. Douglas initially filed the suit, but withdrew after some preliminary discovery was undertaken. He retained a pecuniary interest in the sense that he obtained a promissory note from Sarah Goode for his services, the payment of which was contingent upon her recovery in this action.

It is generally recognized that where an attorney who no longer represents the interested party retains a fee interest in the outcome of the litigation, his testimony on behalf of his former client which involves a personal transaction with the deceased is

barred by the Dead Man's Act. *Suber v. Black*, 168 Ga. 439, 148 S.E. 81 (1929); *Garnett v. Walton*, 242 S.W.2d 107 (Ky. 1951); *see generally* Annot., 67 A.L.R.3d 924 (1975).

There appears to be some confusion as to the exact nature of the fee arrangements. However, we need not decide the issue on this ground. Mr. Douglas's testimony that Waldo related to him several statements made by Isaac N. Morris with regard to having gotten a "Bishop girl" in trouble would be hearsay. It was clearly an out-of-court statement made by another and offered to prove the truth of the matter asserted in the statement. Syllabus Point 9, *State v. Richey*, 171 W.Va. 342, 298 S.E.2d 879 (1982); *Salerno v. Manchin*, 158 W.Va. 220, 213 S.E.2d 805 (1974). Additionally, for the reasons discussed in the next subsection, we do not believe Mr. Douglas's statements would come under the family pedigree exception to the hearsay rule.

### F.

Sarah Goode's testimony was essentially that both her mother and her grandmother, Sarah Fitzwater, who was deceased, had informed her when she was a young girl that Isaac N. Morris was her father. She also testified that her original attorney, Mr. Douglas, who was distantly related to the Morris family, had indicated that her father was Isaac N. Morris. She also spoke of a visit with one of the beneficiaries of the will, Harry Morris, after the suit had been filed. He gave her a photograph of Isaac N. Morris and said that he was her father.

The court ruled that Sarah Goode's testimony concerning the remarks of her mother and grandmother were inadmissible as hearsay. The court did not consider her testimony about Mr. Douglas and the statements of Harry Morris as to her paternity.

This testimony related to family history, which is one of the exceptions at common law to the hearsay rule. This exception is based on a recognition that it is often impossible to establish by independent means the facts of family relation-

ships where several generations are involved and the members are dead or scattered in other jurisdictions. At common law, family history or pedigree could be proved in one of two ways: by general reputation evidence or by specific extrajudicial statements from family members who were unavailable at trial. Where specific statements are sought to be introduced, several restrictions had to be met, i.e., the declaration had to be made by family members, the declarant had to be unavailable, the statements had to have been made prior to the litigation in which it is offered (ante litem motam), and there had to be no apparent motive for the declarant to misrepresent the facts. *See generally* McCormick, *supra* at § 322; F. Cleckley, *supra* at 535; 29 Am.Jur.2d *Evidence* §§ 508–515 (1967); Annot., 15 A.L.R.2d 1415 (1951).

We have in general followed the common law distinction between general reputation of family history and specific statement testimony. In *Peterson v. Ankrom*, 25 W.Va. 56 (1884), two affidavits were sought to be introduced in which the affiants stated they were intimately acquainted with a John Phillips and his family and that he died intestate leaving a widow who was now deceased and one child, William Phillips, now living. We

made this statement as to the general reputation rule: "Facts of this character may be proved by general reputation in the family by the testimony of witnesses whose knowledge of that repute and of the conduct of members toward each other, is that which usually exists among intimate acquaintances." 25 W.Va. at 62.

In *Butcher v. Sommerville*, 67 W.Va. 261, 67 S.E. 726 (1910), we acknowledged as to specific declarations of pedigree that the "declarant must be unavailable by death or otherwise." 67 W.Va. at 263, 67 S.E. at 727. Finally, in *Prickett v. Frum*, 101 W.Va. 217, 132 S.E. 501 (1926), we held that a family geneology prepared and introduced by a relative from facts obtained from family records and information obtained from older family members, since deceased, was admissible to prove the names of great-grandchildren.

In the Rules of Evidence, the family history exception by reputation testimony is found in Rule 803(19).[23] Rule 804(b)(4) relates to specific statements concerning a person's family relationship and has altered the common law rule to some degree.[24] This section still retains the initial qualification that the declarant be unavailable as a witness.[25] It does not require that the statements be made in advance of the liti-

---

**23.** Rule 803(19) states:

"*Reputation Concerning Personal or Family History.*—Reputation among members of his family by blood, adoption, or marriage, or among his associates, or in the community, concerning a person's birth, adoption, marriage, divorce, death, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of his personal or family history."

**24.** Our Rule 804(b)(4) is the same as Federal Rule 804(b)(4), and the Advisory Committee's note to this rule explains the changes made to the common law:

"The general common law requirement that a declaration in this area must have been made *ante litem motam* has been dropped, as bearing more appropriately on weight than admissibility. See 5 Wigmore § 1483. Item (i)[ (A) ] specifically disclaims any need of firsthand knowledge respecting declarant's own personal history. In some instances it is self-evident (marriage) and in others impossible and traditionally not required (date of birth). Item (ii)[B] deals with declarations concerning the history of another person. As

at common law, declarant is qualified if related by blood or marriage. 5 Wigmore § 1489. In addition, and contrary to the common law, declarant qualifies by virtue of intimate association with the family. Id., § 1487. The requirement some times encountered that when the subject of the statement is the relationship between two other persons the declarant must qualify as to both is omitted. Relationship is reciprocal. Id., § 149.

"For comparable provisions, see Uniform Rule 63(23), (24), (25); California Evidence Code §§ 1310, 1311; Kansas Code of Civil Procedure § 60–460(u), (v), (w); New Jersey Evidence Rules 63(23), 63(24), 63(25)."

**25.** Rule 804(b)(4) states:

"*Hearsay Exceptions.*—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\*    \*    \*    \*    \*    \*

"(4) Statement of Personal or Family History.—(A) A statement concerning the declarant's own birth, adoption, marriage, divorce, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of

 

gation. The rule specifically provides that the declarant need not have "means of acquiring personal knowledge of the matter stated." It is not necessary that the declarant be family related if "so intimately associated with the other's family as to be likely to have accurate information concerning the matter declared." Rule 804(b)(4). We seemed to have accepted this point in *Peterson, supra,* since the affiants were intimately acquainted and not family members.

As earlier pointed out, Sarah Goode's testimony involved specific statements made by family members. We believe the court erred in rejecting her testimony as to her grandmother's statement. Her grandmother was dead at the time of trial, and the statement came within Rule 804(b)(4), upon the showing of unavailability. For the same reason, however, the specific statements of Sarah Goode's mother, Mr. Douglas, and Mr. Morris were inadmissible simply because these individuals were all available.

## VI.

In view of these evidentiary rulings, which have removed all of the documentation, we are brought to the conclusion that the trial court was correct in holding that the clear and convincing standard had not been met. The only admissible evidence that bore directly on the paternity issue was Mrs. Shamblin's testimony that Sarah Goode was the daughter of Isaac N. Morris, and Sarah Goode's testimony of a similar statement from her deceased grandmother. The deposition testimony from Orville Starcher, who was a friend of Waldo Morris, is somewhat equivocal. He stated that on one occasion, Waldo had told him that his father had gotten in trouble with a girl from around Ivydale.

The evidence in this case is less substantial than that in *Farley,* where paternity was not established. In *Farley,* the mother had spent most of her time with the putative father for some five months before the baby was born and had no associa-

tion with any other men. The mother was under sixteen at the time of the child's birth and her parents instigated a rape charge. This resulted in the putative father marrying the mother. There was also some evidence, oral and documentary, that indicated the decedent acknowledged paternity.

In this case, there is a lack of any evidence as to how long the parties were together before the child was born or any evidence of acknowledgment. Courts in other jurisdictions have refused to disturb a trial court's finding that paternity was not proved based on facts of the relationship and the acknowledgment of paternity by the putative father more persuasive and more detailed than in this case. *Morelli v. Battelli,* 68 Ill.App.3d 410, 25 Ill.Dec. 57, 386 N.E.2d 328 (1979); *Cobb v. Thomas,* 615 S.W.2d 508 (Mo.App.1981); *Estate of Hoffman,* 320 Pa.Super. 113, 466 A.2d 1087 (1983).

For the foregoing reasons, we affirm the judgment of the Circuit Court of Clay County.

AFFIRMED.

---

personal or family history, even though declarant had no means of acquiring personal knowledge of the matter stated; or (B) a statement concerning the foregoing matters, and death also, of another person, if the declarant was related to the other by blood, adoption, or marriage or was so intimately associated with the other's family as to be likely to have accurate information concerning the matter declared."