438 S.E.2d 318

**Pauline MARTIN, Personal Representative of the Estate of James Martin, Plaintiff–Appellee,**

v.

**David H. SMITH, M.D., Defendant–Appellant.**

**No. 21267.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 15, 1993.

Decided Nov. 23, 1993.

---

James G. Bordas, Jr., James B. Stoneking, Bordas, Bordas & Jividen, Wheeling, for plaintiff-appellee.

George E. McLaughlin, Jeffrey A. Holmstrand, Rhonda L. Wade, Bachman, Hess, Bachman & Garden, Wheeling, for defendant-appellant.

NEELY, Justice:

In this wrongful death action, David H. Smith, M.D., a psychiatrist, appeals from a $650,000 judgment entered against him on 11 September 1991 in the Ohio County Circuit Court. Mrs. Pauline Martin, mother of James Martin (hereinafter "the decedent") asserted that Dr. Smith deviated from the

accepted standard of care in his treatment of the decedent, an involuntarily-committed man and that Dr. Smith's malpractice resulted in the decedent's suicide. The lower court found for Mrs. Martin and awarded $200,000 to her individually and $450,000 to the decedent's young daughter.

The decedent was twenty years old when he died. He was raised in Wheeling by his mother Pauline Martin. Mrs. Martin is mentally retarded and receives monthly SSI as her sole source of income. The decedent attended Wheeling public schools and was graduated from Wheeling Park High School in 1982.

At the age of fourteen, the decedent fathered a child to Laura Brown, also fourteen. The child, Monique Michelle Brown, was born on 7 July 1979. The decedent occasionally visited Monique. Although never ordered to pay child support, he periodically bought gifts and necessaries for the child.

In fall 1982, the decedent enrolled at West Virginia University, pursuing a liberal arts curriculum and earning low to mediocre grades. After three semesters, in January 1984, the decedent transferred to West Liberty State College and pursued general business studies. There, his academic performance steadily declined, his grade point average eventually slipping to a 1.3.

In February 1985, the decedent began exhibiting a pattern of aggressive behavior. He was unruly and disruptive in the classroom. When relieved of his duties as a campus security officer for spinning "doughnuts" with his car on campus, the decedent angrily confronted his co-workers for allegedly reporting him. On 28 February 1985, the decedent yelled at his roommate and brandished a steak knife menacingly; when taken into custody by campus security officers, he made threats and babbled incoherently.

On the evening of 28 February 1985, the decedent was admitted to the psychiatric unit at the Ohio Valley Medical Center where his aggressive behavior continued. The decedent was medicated and put into restraints.

Dr. Smith was the decedent's treating physician for the duration of his stay at the psychiatric unit. Upon the decedent's admission, Dr. Smith failed to undertake a mental status exam, the comprehensive report and assessment of a patient's status that serves as a base of knowledge for the physician. Dr. Smith immediately prescribed heavy doses of mood elevators and tranquilizers. The decedent's condition improved after he was medicated but hospital records show he continued to be aggressive and needed to be physically restrained on a number of occasions.

On 25 April 1985, the decedent, returning late from a two hour pass, grew uncontrollably angry, boisterous and disruptive. When put into seclusion, he became violent, hitting a surveillance camera with his hand and beating incessantly on the door.

On 6 May 1985, Dr. Smith decided to transfer the decedent to Weston State Hospital for more specialized care. As nurses' notes contained in the decedent's medical records indicate, the decedent reacted to the prospect of such a transfer with confusion, anxiety and depression.

On 7 May 1985, Dr. Smith abruptly discontinued all of the decedent's medications. The decedent exhibited nonpsychotic controlled behavior until 11 May 1985 when his behavior once again became completely uncontrolled.

On 11 May 1985, Dr. Smith released the decedent on an eight hour pass, his first ever from the unit. Dr. Smith did not know that Mrs. Martin was mentally retarded and made no inquiry into Mrs. Martin's competency. Nor did he inquire into the decedent's accessibility to weapons despite his known suicidal and homicidal tendencies. No specific instructions were given to Mrs. Martin by Dr. Smith or by the staff nor was mention made of security precautions.

While at his mother's home that day, the decedent continued to express concern about the possibility of his transfer to Weston State Hospital and asked questions about death and hell. He then went upstairs to his bedroom, took a gun from the gun cabinet and shot himself. He died instantly.

On 7 May 1987, Mrs. Martin filed an action for wrongful death in the Ohio County Cir-

cuit Court. By agreement both parties waived a jury trial and opted to try the case to the court alone. In a memorandum opinion dated 9 September 1991, the court specifically made findings that Dr. Smith was guilty of negligence and that his negligence was a proximate cause of the decedent's suicide. Particular attention was drawn to the following factors: the decedent's known history of suicidal and homicidal tendencies and proneness to violence; his fear of hospitalization generally and of a planned transfer to Weston State Hospital in particular; the abrupt discontinuation of the decedent's medications immediately before his release; and Dr. Smith's failure to inquire into security at the decedent's home and into the decedent's accessibility to weapons.

## I.

■ Dr. Smith maintains the lower court erroneously applied the Dead Man's Statute in disregarding his testimony concerning conversations with the decedent.

■ The Dead Man's Statute is a rule that prohibits a survivor in a transaction with a dead person to testify because the lips of the decedent are sealed and there is too great a danger that interested survivors will take advantage of the decedent's estate. F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* 40 (1986); Note, "Re-evaluation of the Dead Man's Statute," 69 W.Va. L.Rev. 327, 328 (1967). Where a survivor either makes a claim against the decedent's estate or is interested in such a claim and the decedent is unable to confront that survivor, give his version of the affair and expose the possible omissions, mistakes or perhaps even outright falsehoods of the survivor, the Dead Man's Statute precludes the survivor interested in the case from testifying. *Miami Coal Co., Inc., v. Hudson*, 175 W.Va. 153, 332 S.E.2d 114 (1985). In the case before us, the statute appropriately barred Dr. Smith from testifying about his transactions with the decedent because the decedent was unable to confirm or deny his allegations.

■ We have recognized, however, that the Dead Man's Statute does not preclude the beneficiaries of the decedent's estate from testifying and if they testify as to the decedent's transaction, then there is a waiver of the statutory bar as to the other side. *Moore v. Goode*, 180 W.Va. 78, 375 S.E.2d 549 (1988). Thus, while Dr. Smith does not dispute that the Dead Man's Statute is facially applicable to his testimony, he claims that under this exception to the Dead Man's Statute Ms. Martin waived her right to object by offering testimony of conversations between him and the decedent. We agree with this contention.

■ However, in view of what is established by the record, we think the error in not admitting the testimony of Dr. Smith was harmless. Dr. Smith contends that the testimony barred by the Dead Man's Statute, to wit, that he had informed the decedent that he would not be transferred to Weston State Hospital, was vital to the presentation of his defense. However, three witnesses independently testified to that same fact: two nurses testified on Smith's behalf that the decedent was advised that the transfer would not occur and a staff psychologist testified that he had personally advised the decedent that the transfer would not occur at the scheduled time.

Moreover, the whole issue of the transfer is not dispositive of the outcome of the case: Mrs. Martin's experts identified no less than six deviations from the accepted standard of care, any one of which was sufficient to sustain the judge's finding that Dr. Smith was guilty of negligence that proximately caused the decedent's death. Thus, although the Dead Man's Statute was waived by Mrs. Martin's testimony, we find the lower court's error was harmless.

## II.

■ Dr. Smith asserts that Ms. Martin waived any objection she may have had to the testimony by Dr. Smith when her counsel inquired into conversations between the decedent and Dr. Smith during Dr. Smith's deposition.

■ We have found several circumstances in which the incompetency of a witness under the Dead Man's Statute may be waived by the acts of the adverse party. As

we stated above, the incompetency of a witness is considered waived when the protected party testifies on his own behalf as to the transaction or communication. *See Coleman v. Wallace*, 143 W.Va. 669, 104 S.E.2d 349 (1958). Similarly, there is a waiver if the deceased has been examined in his own behalf. *Moore v. Moore*, 87 W.Va. 9, 104 S.E. 266 (1920). There is also a waiver if the protected party has elected to call to the stand the incompetent witness, who then can explain all matters about which he is examined. *Holland v. Joyce*, 155 W.Va. 535, 185 S.E.2d 505 (1971). Finally, there is a waiver if the incompetency of the witness is not timely protested. *See First Nat'l Bank v. Bell*, 158 W.Va. 827, 215 S.E.2d 642 (1975).

But the mere taking of a deposition of a witness who is incompetent under the Dead Man's Statute by an adverse party for purposes of discovery is not a waiver of the witness' incompetency unless the deposition is offered as evidence by the adverse party. Since Ms. Martin did not offer Dr. Smith's deposition into evidence, Dr. Smith's incompetency under the Dead Man's Statute was not waived.

### III.

■ Dr. Smith maintains that the court erred in permitting the testimony of Robert J. Adams, Ph.D. as a rebuttal witness by plaintiff's counsel because Ms. Martin failed to disclose Dr. Adams as an expert witness in a timely manner in violation of Rule 26(e), *West Virginia Rules of Civil Procedure.* Rule 26(e), *W.V.R.C.P.* provides in pertinent part:

A party is under a duty seasonably to supplement his response with respect to any [discovery request] directly addressed to ... the identity of each person expected to be called as an expert witness at trial ...

In *Prager v. Meckling*, 172 W.Va. 785, 790, 310 S.E.2d 852, 856 (1983), we listed four factors a court must consider in determining whether the failure to supplement discovery requests under Rule 26(e) should require exclusion of evidence related to the supplementary material:

1. the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified;

2. the ability of that party to cure the prejudice;

3. the extent to which the waiver of the rule would disrupt the orderly and efficient trial of the case or of other cases in the court;

4. bad faith or willfulness in failing to comply with the court's order.

Dr. Smith offered no evidence to support a finding of bad faith or willfulness on the part of Mrs. Martin in failing to disclose Dr. Adams at an earlier time. Nor do we find any evidence in the record that the admission of Dr. Adams' testimony disrupted the orderly disposition of the trial. Finally, even given that the admission of Dr. Adams' testimony prejudiced Dr. Smith's case, we find such prejudice far from incurable. Dr. Smith could have easily moved for a continuance in order to secure a comparable expert witness. We therefore find that the court did not abuse its discretion in admitting Dr. Adams' testimony.

### IV.

■ Dr. Smith also asserts that the lower court erred in awarding damages for the deceased's reasonably expected loss of income. According to Dr. Smith, Mrs. Martin introduced insufficient testimony as to the decedent's reasonably expected income.

■ Under *W.Va.Code* sec. 55-7-6(c)(1)(B) [1985], the lower court has authority to award "compensation for reasonably expected loss of (i) income of the decedent ..." In determining such compensation, including a deceased's probable earnings, the deceased's age, earnings, experience and habits during his lifetime should be considered. *Bowman v. Barnes*, 168 W.Va. 111, 282 S.E.2d 613 (1981).

We find that the lower court made no error in assessing damages for the loss of income suffered by Mrs. Martin and the decedent's young daughter. In spite of the difficult circumstances of his upbringing, the decedent worked odd jobs as a student to assist his mother with household expenses.

He also purchased gifts and necessaries for his daughter from the modest sums he earned at odd jobs. The decedent was the first in his family to attend college where he received financial assistance. There is no reason that the decedent, if properly treated, could not have provided services, protection, care and assistance to his mother and child.

### V.

■ In his final assignment of error, Dr. Smith contends that Mrs. Martin was not a "dependent" within the meaning of the wrongful death statute because the decedent rendered no financial assistance and services to his mother and could not be expected to do so in the future.

■ West Virginia's wrongful death statute is remedial, and is liberally construed to effect the Legislature's intent. *See Baldwin v. Butcher,* 155 W.Va. 431, 184 S.E.2d 428 (1971). We have consistently given "more than lip service to this rule of liberal construction." *Bond v. City of Huntington,* 166 W.Va. 581, 276 S.E.2d 539 (1981). Accordingly, the word "dependent" in our wrongful death statute has been read very broadly: West Virginia does not "require that the surviving dependent be legally dependent on the deceased for the support but only that, in fact, they were receiving some money or services from the deceased." *Bond,* 166 W.Va. at 589, 276 S.E.2d at 547 (1981).

Mrs. Martin was mentally retarded, unemployed and lived on a fixed income. The decedent worked odd jobs as a student and contributed to household expenses. He also purchased his own clothes and furniture for his mother's home and helped his mother to the full extent of his capabilities. These facts are sufficient to support the court's finding that Mrs. Martin was entitled to a distributive share of the damages assessed in this case.

For the foregoing reasons, the judgment of the Ohio County Circuit Court is affirmed.

Affirmed.