571 S.E.2d 317

Sandra K. HICKS, Administratrix of the Estate of Charles R. Hicks, Deceased, Plaintiff Below, Appellant,

v.

David A. GHAPHERY, M.D., and Wheeling Hospital, Defendants Below, Appellees.

No. 30088.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 19, 2002.

Decided July 2, 2002.

Concurring and Dissenting Opinion of Justice McGraw July 3, 2002.

Concurring and Dissenting Opinion of Justice Starcher July 9, 2002.

Frank Cuomo, Esq., Jason A. Cuomo, Esq., Cuomo & Cuomo, Wellsburg, for Sandra Hicks.

William E. Galeota, Esq., Rodney L. Bean, Esq., Steptoe & Johnson, Morgantown, James C. Wright, Esq., Steptoe & Johnson, Wheeling, for David Ghaphery, M.D.

Patrick S. Casey, Esq., Flaherty, Sensabaugh & Bonasso, Wheeling, for Wheeling Hospital.

MAYNARD, Justice.

This case is before this Court upon appeal of a final order of the Circuit Court of Brooke County entered on August 7, 2001. In that order, the circuit court denied a motion for a new trial filed by the appellant and plaintiff below, Sandra Hicks, Administratrix of the Estate of Charles R. Hicks, deceased (hereinafter "appellant"), in this wrongful death action filed against the appellees and defendants below, Charles Ghaphery, M.D., and Wheeling Hospital.[1] In the same order, the circuit court also denied the appellant's motion for reconsideration of the order granting summary judgment in favor of Wheeling Hospital. In this appeal, the appellant presents several assignments of error in support of her contention that the circuit court's final order should be reversed.

This Court has before it the petition for appeal, the entire record, and the briefs and argument of counsel. For the reasons set forth below, the final order is affirmed, in part, and reversed, in part, and this case is remanded to the circuit court for further proceedings.

## I. FACTS

On April 12, 1996, Charles Hicks was severely injured in a motor vehicle accident when his motorcycle was struck by an oncoming motorist, Kathleen Stewart. Mr. Hicks was transported to Wheeling Hospital where he was treated by Dr. Ghaphery, a trauma surgeon. Mr. Hicks was also treated by Drs. Howard Shackleford and Christopher Marquart. Mr. Hicks suffered numerous severe injuries including a T-6 vertebral fracture with a severing of the spinal cord. As a result of this injury, Mr. Hicks was rendered a paraplegic. Mr. Hicks remained hospitalized for three weeks. He was then admitted to a rehabilitation center in Pennsylvania.

Mr. Hicks' condition put him at risk of developing deep vein thrombosis[2] (hereinafter "DVT") and pulmonary embolism.[3] Accordingly, before Mr. Hicks was discharged from the Wheeling Hospital, he underwent a radiographic examination of his lower extremities. The x-rays showed no evidence of DVT. Upon his arrival at the rehabilitation center, Mr. Hicks underwent another examination for blood clots. Again, there was no evidence of DVT.

---

1. As discussed herein, this action was also brought against Kathleen Stewart, Dr. Howard Shackleford and Dr. Christopher Marquart. Ms. Stewart did not appeal the jury verdict rendered against her, and Drs. Shackleford and Marquart were dismissed from the case prior to trial. Thus, these defendants are not parties in this appeal.

2. Deep vein thrombosis is "a condition involving a blood clot (thrombus) in a deep vein." *The Mosby Medical Encyclopedia* 233 (Revised ed.1992).

3. Pulmonary embolism is "the blockage of a lung (pulmonary) artery by foreign matter, as fat, air, tumor tissue, or a blood clot." *The Mosby Medical Encyclopedia* 649 (Revised ed.1992).

On May 21, 1996, approximately three weeks after he was discharged from the Wheeling Hospital and Dr. Ghaphery's care, Mr. Hicks died while being transported for his daily physical therapy at the rehabilitation center. An autopsy revealed the cause of death to be a massive pulmonary embolism which probably originated in a lower extremity.

Thereafter, the appellant filed suit against Kathleen Stewart alleging that Mr. Hicks died as a result of her negligent driving.[4] On June 9, 1998, the appellant amended her complaint to add as defendants, Drs. Ghaphery, Shackleford, and Marquart, and Wheeling Hospital.[5] The appellant alleged that the defendant doctors failed to recommend the insertion of an inferior vena cava filter into Mr. Hicks' lumbar region to prevent blood clots from reaching his lungs. The appellant further alleged that Wheeling Hospital was vicariously liable because the defendant doctors were its ostensible agents.

On October 6, 2000, the circuit court granted Wheeling Hospital's motion for summary judgment, and it was dismissed from the case. The case proceeded to trial with Dr. Ghaphery and Kathleen Stewart as defendants on October 30, 2000. On November 3, 2000, the jury returned a verdict finding Kathleen Stewart to be 100% at fault. The jury awarded damages to the appellant in the amount of $1,179,771.89.

On January 16, 2001, the appellant filed a motion for a new trial. She also sought reconsideration of the circuit court's prior order granting summary judgment in favor of Wheeling Hospital. The motions were denied on February 10, 2001, and the final order was entered on August 7, 2001. This appeal followed.

## II. DISCUSSION

The appellant asserts four assignments of error relating to the trial of this case. She also claims that the circuit court erred by granting summary judgment in favor of Wheeling Hospital. We discuss each assignment of error below noting the applicable standard of review where appropriate.

### A. The Mistake of Judgment Instruction

The appellant first contends that the circuit court erred when it gave the jury the "mere mistake of judgment" instruction from *Dye v. Corbin,* 59 W.Va. 266, 53 S.E. 147 (1906). The jury was instructed as follows:

> The Court instructs the jury that where a physician exercises ordinary skill and diligence, keeping within recognized and approved methods, he is not liable for a mere mistake in judgment. However, a physician is liable for the result of an error of judgment where that error is inconsistent with reasonable and prudent care.

■ The appellant maintains that the instruction was an improper statement of the law because this Court held in Syllabus Point 5 of *Pleasants v. Alliance Corp.,* 209 W.Va. 39, 543 S.E.2d 320 (2000), that:

> The "mistake of judgment" jury instruction, which this Court first approved in *Dye v. Corbin,* 59 W.Va. 266, 53 S.E. 147 (1906), wrongly injects subjectivity into an objective standard of care, is argumentative and misleading, and should no longer be used to instruct the jury concerning the relevant standard of care in a medical malpractice action. Accordingly, we hereby overrule *Dye v. Corbin,* 59 W.Va. 266, 53 S.E. 147 (1906), and its progeny, insofar as those cases approve the giving of a "mistake of judgment" instruction.

Although this Court found that the giving of the "mistake of judgment" instruction in *Pleasants* was harmless error, we recently held in *Yates v. University of West Virginia Bd. of Trustees,* 209 W.Va. 487, 549 S.E.2d 681 (2001), that such an instruction can constitute reversible error.

The appellant argues her case is on point with *Yates* and, therefore, the mistake of judgment instruction was improper and she should be granted a new trial. However, Dr. Ghaphery argues that the mistake of judgment instruction was a correct statement of

---

4. Kathleen Stewart admitted liability prior to trial. As previously noted, she did not appeal the jury's assessment of damages against her.

5. The appellant reached a settlement with Dr. Shackleford and voluntarily dismissed Dr. Marquart from the case prior to trial.

the law at the time of trial and that *Pleasants* and *Yates* cannot be retroactively applied to this case. Alternatively, Dr. Ghaphery argues that the instruction was at the most, harmless error.

■ In Syllabus Point 5 of *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979), this Court stated that:

In determining whether to extend full retroactivity, the following factors are to be considered: First, the nature of the substantive issue overruled must be determined. If the issue involves a traditionally settled area of law, such as contracts or property as distinguished from torts, and the new rule was not clearly foreshadowed, then retroactivity is less justified. Second, where the overruled decision deals with procedural law rather than substantive, retroactivity ordinarily will be more readily accorded. Third, common law decisions, when overruled, may result in the overruling decision being given retroactive effect, since the substantive issue usually has a narrower impact and is likely to involve fewer parties. Fourth, where, on the other hand, substantial public issues are involved, arising from statutory or constitutional interpretations that represent a clear departure from prior precedent, prospective application will ordinarily be favored. Fifth, the more radically the new decision departs from previous substantive law, the greater the need for limiting retroactivity. Finally, this Court will also look to the precedent of other courts which have determined the retroactive/prospective question in the same area of the law in their overruling decisions.

In *Bradley*, this Court adopted the doctrine of comparative negligence and held that the decision was fully retroactive. 163 W.Va. at 351, 256 S.E.2d at 890. In so holding, this Court explained that "[r]etroactivity of an overruling decision is designed to provide equality of application to the overruling decision because its new rule has been consciously designed to correct a flawed area of the law." Syllabus Point 4, *Bradley*.

■■ Considering the factors set forth in *Bradley* and being mindful that *Pleasants* · was clearly designed to correct a flawed area

of the law, we find *Pleasants* and *Yates* applicable to the case at bar. We further find, as we did in *Yates*, that the giving of the mistake in judgment instruction by the circuit court in this case constitutes reversible error. The primary issue in *Yates* concerned the decision by the appellant's physicians to treat the appellant's blocked artery with interventional radiology as opposed to immediate surgery to remove the blockage. This Court found that the mistake of judgment instruction given to the jury in *Yates* more likely than not influenced the jury's decision. 209 W.Va. at 497–98, 549 S.E.2d at 691. Since we had previously determined in *Pleasants* that such instruction is misleading and wrongly injects subjectivity into an objective standard of care, we concluded that the appellant was entitled to a new trial. *Id.*

Like *Yates*, the primary issue in this case was the physician's judgment with respect to the proper treatment for his patient's condition. Therefore, we cannot say that the mistake of judgment instruction given by the trial court was harmless error. Accordingly, the appellant is entitled to a new trial.

### B. The Informed Consent Instruction

The appellant next contends that the circuit court erred by refusing to give the jury an informed consent instruction pursuant to *Cross v. Trapp*, 170 W.Va. 459, 294 S.E.2d 446 (1982). In Syllabus Points 2 and 3, respectively, of *Cross*, this Court held that:

A physician has a duty to disclose information to his or her patient in order that the patient may give to the physician an informed consent to a particular medical procedure such as surgery. In the case of surgery, the physician ordinarily should disclose to the patient various considerations including (1) the possibility of the surgery, (2) the risks involved concerning the surgery, (3) alternative methods of treatment, (4) the risks relating to such alternative methods of treatment and (5) the results likely to occur if the patient remains untreated.

In evaluating a physician's disclosure of information to his or her patient, relative to whether that patient gave an informed consent to a particular medical procedure

such as surgery, this Court hereby adopts the patient need standard, rather than physician disclosure standards based upon national or community medical disclosure practice. Pursuant to the patient need standard, the need of the patient for information material to his or her decision as to method of treatment, such as surgery, is the standard by which the physician's duty to disclose is measured. Under the patient need standard, the disclosure issue is approached from the reasonableness of the physician's disclosure or nondisclosure in terms of what the physician knows or should know to be the patient's informational needs. Therefore, whether a particular medical risk should be disclosed by the physician to the patient under the patient need standard ordinarily depends upon the existence and materiality of such risk with respect to the patient's decision relating to medical treatment.

The appellant argues that the jury should have been instructed that if they believed that Dr. Ghaphery advised Mr. Hicks of the vena cava filter option, then Dr. Ghaphery had to satisfy the informed consent standard as set forth in *Cross*.

 In Syllabus Point 4 of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), this Court held that:

A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead [sic] by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

This Court has also stated that:

"It will be presumed that a trial court acted correctly in giving or in refusing to give instructions to the jury, unless it appears from the record in the case that the instructions were prejudicially erroneous or that the instructions refused were correct and should have been given." Syllabus Point 1, *State v. Turner*, 137 W.Va. 122, 70 S.E.2d 249 (1952).

Syllabus Point 1, *Moran v. Atha Trucking, Inc.*, 208 W.Va. 379, 540 S.E.2d 903 (1997). The circuit court ruled that an informed consent instruction was not necessary in this case because Dr. Ghaphery testified that he did not recommend the vena cava filter procedure to Mr. Hicks. In other words, the circuit court concluded that an informed consent instruction is only appropriate when a physician recommends a particular procedure to a patient.

The appellant asserts that whether a physician recommends a procedure to a patient is irrelevant to the application of this Court's decision in *Cross*. In support of this argument, the appellant relies upon a case in which the New Jersey Supreme Court held that "physicians do not adequately discharge their responsibility by disclosing only treatment alternatives that they recommend." *Matthies v. Mastromonaco*, 160 N.J. 26, 37, 733 A.2d 456, 462 (1999).

In *Matthies*, an eighty-one-year-old patient sued her orthopedic surgeon alleging lack of informed consent and malpractice regarding his decision to treat her hip fracture with bed rest. The surgeon did not advise the patient of the option of surgery to pin her hip with screws because he did not think that would be an appropriate course of treatment given her other medical problems. The patient was never able to walk again. At trial, the court refused to instruct the jury on the issue of lack of informed consent because the treatment administered was noninvasive. However, on appeal, the Supreme Court of New Jersey held that "[f]or consent to be informed, the patient must know not only of alternatives that the physician recommends, but of medically reasonable alternatives that the physician does not recommend." *Id.*, 160 N.J. at 38, 733 A.2d at 462.

Based on *Matthies*, the appellant contends that she was entitled to an informed consent instruction. We disagree because *Matthies* is clearly distinguishable from the case at bar. In *Matthies*, bed rest was the chosen course of treatment for the claimant's hip injury and thus, the court found that the patient was entitled to be informed of reasonable treatment alternatives. That decision is consistent with our holding in *Cross*. As noted above, this Court held in Syllabus Point 2 of *Cross* that "the physician ordinarily should disclose to the patient ... alternative methods of treatment[.]"

However, this case does not involve a chosen course of treatment. To the contrary, the issue is the physician's decision to not perform a certain procedure, i.e., insertion of a vena cava filter. As Syllabus Point 2 of *Cross, supra*, illustrates, the duty of disclosure is predicated upon a recommended treatment or procedure. Thus, by asserting that she was entitled to an informed consent instruction as set forth in *Cross*, the appellant is asking this Court to extend the duty of disclosure to procedures not recommended by the physician. This precise issue was addressed in *Vandi v. Permanente Medical Group, Inc.*, 7 Cal.App.4th 1064, 9 Cal. Rptr.2d 463 (1992).

In *Vandi*, the patient sued his physician for failing to perform a computerized tomography (C.T.) scan after he suffered a seizure. The court refused to instruct the jury that the physician could be found liable for failing to advise the patient of the availability of the C.T. scan; the possibility that it could detect a large brain abscess; and the risks in waiting for the scan that was eventually performed. On appeal, the plaintiff argued that the physician had a duty to disclose information about the nonrecommended procedure. The *Vandi* court explained that,

> One difficulty with the rule proposed by plaintiff is that it is inherently and irrevocably wedded to medical hindsight. After a medical condition has been discovered it may be relatively easy to look back and identify a diagnostic procedure which would have revealed the condition but which was not medically indicated at the time. But in treating a patient a physician can consider only what is known at the time he or she acts. At the time of treatment there may be dozens, perhaps even hundreds, of diagnostic procedures which could reveal a rare and unforeseen medical condition but which are not medically indicated. Under plaintiff's proposed theory the doctor would be required to explain each and every possible diagnostic procedure regardless whether he or she believes it to be medically indicated.

*Vandi*, 7 Cal.App.4th at 1070, 9 Cal.Rptr.2d at 467. The *Vandi* court concluded that "[i]t would be anomalous to create a legally imposed duty which would require a physician to disclose and offer to a patient a medical procedure which, in the exercise of his or her medical judgment, the physician does not believe to be medically indicated." *Id.*, 7 Cal.App.4th at 1071, 9 Cal.Rptr.2d at 467.

Like the *Vandi* court, we believe "it would be inappropriate to impose such an imprecise and unpredictable burden upon a physician." *Id.*, 7 Cal.App.4th at 1070, 9 Cal.Rptr.2d at 467. Therefore, we find that the jury must assess a physician's failure to recommend a procedure in terms of whether he or she violated the applicable standard of care. In other words, "[i]f the procedure is one which should have been proposed, then the failure to recommend it would be negligence under ordinary medical negligence principles and there is no need to consider an additional duty of disclosure." *Id.*

Having reviewed the record, we find that the appellant's theory of the case, that Dr. Ghaphery was negligent in failing to insert a vena cava filter in Mr. Hicks' back, was properly submitted to and considered by the jury. Therefore, the circuit court did not abuse its discretion when it instructed the jury.

## C. Impeachment

The appellant next contends that the circuit court erred by denying her the right to cross-examine Dr. Ghaphery about prior malpractice actions, settlements, and judgments against him for impeachment purposes after he testified that he was rated in a magazine as being not only one of the best

doctors in the area, but also one of the best doctors in America. The appellant maintains that Dr. Ghaphery's testimony was irrelevant and prejudicial and opened the door for impeachment through prior medical malpractice actions, settlements, and judgments.

■ "Absent a few exceptions, this Court will review evidentiary and procedural rulings of the circuit court under an abuse of discretion standard." Syllabus Point 1, in part, *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995). The record in this case shows that although the appellant was not permitted to impeach Dr. Ghaphery on this point, the court gave her the option of either a curative instruction or a mistrial. Because she had already presented her entire case-in-chief, the appellant chose the curative instruction. Thus, the jury was instructed as follows:

> Doctor Ghaphery, in response to a question from Mr. Galeota, has attempted to portray himself as one of the best doctors in the area, as well as in America. You are instructed that you must not consider this as true. You are to disregard it, not consider it or include it in your deliberations. It is stricken from the record.

■ " " 'Ordinarily where objections to questions or evidence by a party are sustained by the trial court during the trial and the jury instructed not to consider such matter, it will not constitute reversible error." Syl. pt. 18, *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966).' Syl. pt. 3, *State v. Lusk*, [177] W.Va. [517], 354 S.E.2d 613 (1987)." Syllabus Point 2, *State v. Ayers*, 179 W.Va.

365, 369 S.E.2d 22 (1988). Having thoroughly reviewed the record and considered the testimony at issue, we do not find that the trial court abused its discretion by giving the curative instruction and refusing to allow the appellant to cross-examine Dr. Ghaphery about prior malpractice actions.

### D. Applicability of the Dead Man's Statute

■ The appellant also contends that the circuit court erred by permitting Dr. Ghaphery to testify about the conversation he allegedly had with Mr. Hicks concerning the vena cava filter. The appellant asserts that this testimony should have been prohibited pursuant to W.Va.Code § 57-3-1 (1937), known as the Dead Man's Statute.[6]

"To summarize the basic operation of the Dead Man's Act, W.Va.Code, 57-3-1, a concurrence of three general conditions must be met in order to bar the witness's testimony. First, the testimony must relate to a personal transaction with a deceased or insane person. Second, the witness must be a party to the suit or interested in its event or outcome. Third, the testimony must be against the deceased's personal representative, heir at law, or beneficiaries or the assignee or committee of an insane person." Syllabus Point 10, *Moore v. Goode*, 180 W.Va. 78, 375 S.E.2d 549 (1988).

Syllabus Point 6, *Cale v. Napier*, 186 W.Va. 244, 412 S.E.2d 242 (1991). The appellant contends that all three conditions set forth in *Cale* were met in this case, and, therefore,

---

6. W.Va.Code § 57-3-1 provides:

No person offered as a witness in any civil action, suit or proceeding, shall be excluded by reason of his interest in the event of the action, suit or proceeding, or because he is a party thereto, except as follows: No party to any action, suit or proceeding, nor any person interested in the event thereof, nor any person from, through or under whom any such party or interested person derives any interest or title by assignment or otherwise, shall be examined as a witness in regard to any personal transaction or communication between such witness and a person at the time of such examination, deceased, insane or lunatic, against the executor, administrator, heir at law, next of kin, assignee, legatee, devisee or survivor of such person, or the assignee or committee of

such insane person or lunatic. But this prohibition shall not extend to any transaction or communication as to which any such executor, administrator, heir at law, next of kin, assignee, legatee, devisee, survivor or committee shall be examined on his own behalf, nor as to which the testimony of such deceased person or lunatic shall be given in evidence: Provided, however, that where an action is brought for causing the death of any person by any wrongful act, neglect or default under article seven [§ 55-7-1 et. seq.], chapter fifty-five of this Code, the person sued, or the servant, agent or employee of any firm or corporation sued, shall have the right to give evidence in any case in which he or it is sued, but he may not give evidence of any conversation with the deceased.

Dr. Ghaphery should not have been permitted to testify that he orally advised Mr. Hicks about the option of a vena cava filter and that Mr. Hicks agreed with his assessment that the filter was not necessary and rejected it.

■ We begin our analysis of this issue by setting forth our standard of review. In *Meadows v. Meadows*, 196 W.Va. 56, 59, 468 S.E.2d 309, 312 (1996), this Court explained that a circuit court's ruling on the admissibility of testimony is reviewed under an abuse of discretion standard. However, "to the extent a circuit court's ruling turns on an interpretation, meaning, or scope of the statute or a rule of evidence our review is *de novo.*" *Id.* With these standards in mind, we now consider whether Dr. Ghaphery's testimony regarding his conversation with Mr. Hicks about the vena cava filter should have been barred pursuant to the Dead Man's Statute.

The circuit court concluded Dr. Ghaphery was not barred from testifying about his conversations with the decedent by the Dead Man's Statute. The court stated:

> In regard to the issues relating to the discussion between the defendant Ghaphery and Mr. Hicks that basically that he had mentioned placement of a vena cava filter, and that was rejected. I think that probably a paraphrase of it, but that's the essence of it.
>
> And the [alleged] error is that that [sic] violated the dead man statute and should have been excluded. I do not think it did. I think Meadows versus Meadows is a case that is going to be the wave of the future insofar as the viability of the dead man statute.
>
> And Justice Cleckley's discussion in that, in that case, I can't—I can't and wouldn't attempt to improve upon it. There are a couple reasons why that, in my opinion, does not violate the dead man statute.
>
> I believe that it is—it is part of an overall colloquy between a doctor and a patient. And, if you were going to exclude that, particularly in a case like this or any other case, it would be open season insofar

as physicians are concerned when their patient dies.

> So I believe that this type of transaction, which is really what I think it might be, if anything, is just all part of the treatment process. I think to have excluded it would have been really—to exclude it would have been the error.

■ We agree with the circuit court. In *Meadows, supra*, this Court concluded that the Dead Man's Statute did not bar a surviving spouse from testifying as to the decedent's appearance and demeanor to support her opinion as to the decedent's competency. In so holding, this Court traced the history and purpose of our present Dead Man's Statute. This Court stated:

> At common law, no party or person interested in the results or outcome of the judicial proceedings was permitted to testify. The interest of a witness was an absolute disqualification which precluded the witness from giving any testimony. "Thus, as a result of inordinate concern about the possibility of witness perjury, the persons having the greatest knowledge of the facts in dispute were often denied the opportunity to relate that information to the trier of fact. Because such sweeping rules of incompetency could cause significant injustice, they were a target for early reformers of the law of evidence[.]" Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence* § 6.1 at 498 (1995). (Footnote omitted).
>
> In 1843, the disqualification of interested persons was removed in England by statute. 6 and 7 Vict. c. 85 (1843). England started the reform that led to the statutory removal of these qualifying elements in practically every state, including West Virginia. The West Virginia statute, now codified as W.Va.Code, 57–3–1, first was adopted in 1868. It states in pertinent part: "No person offered as a witness in any civil action, suit or proceeding, shall be excluded by reason of his interest in the event of the action, suit or proceeding, or because he is a party thereto[.]" Like Rule 601 [of the West Virginia Rules of Evidence], the statute sweeps away the traditional objection to competency of wit-

nesses, but with the following one exception known as the "Dead Man's Statute":

"No party to any action, suit or proceeding, nor any person interested in the event thereof, nor any person from, through or under whom any such party or interested person derives any interest or title by assignment or otherwise, shall be examined as a witness in regard to any personal transaction or communication between such witness and a person at the time of such examination, deceased, insane or lunatic, against the executor, administrator, heir at law, next of kin, assignee, legatee, devisee or survivor of such person[.]"

The purpose of the West Virginia Dead Man's Statute is to prevent the injustice that would result from a surviving party to a transaction testifying favorably to himself or herself and adversely to the interest of a decedent, when the decedent's representatives would be hampered in attempting to refute the testimony by reason of the decedent's death. The statute accomplishes this purpose and aids the estate not by making the testimony itself incompetent but, instead, by making the witness incompetent to testify to such matters. In note 6 of *Cross v. State Farm Mutual Automobile Insurance* Co., 182 W.Va. at 325–26, 387 S.E.2d at 561, we explained that the underlying rationale of dead man's statutes "is that a survivor's lips should be sealed because the lips of the decedent are sealed." In these instances, "the decedent is unable to confront the survivor, give his or her version of the transaction or communication and expose the possible omissions, mistakes or even outright falsehoods of the survivor." 182 W.Va. at 326 n. 6, 387 S.E.2d at 561 n. 6.

196 W.Va. at 60–61, 468 S.E.2d at 313–14.

This Court concluded in *Meadows* that "the language of the Dead Man's Statute should be strictly construed and limited to its narrowest application." 196 W.Va. at 61, 468 S.E.2d at 314. We reasoned that the current version of W.Va.Code § 57–3–1, was "intended to expand the opportunities to use testimony which previously had been excluded." *Id.* Such a reading of the Dead Man's Statute

is consistent with W.Va.R.Evid. 601. Rule 601 provides that "[e]very person is competent to be a witness except as otherwise provided for by statute or these rules." We further explained in *Meadows* that:

[T]he exclusion of the testimony of a party merely because of interest more likely will result in widespread injustices than would a rule of admissibility subject to the traditional adversarial testing. See *Gentry v. Mangum*, 195 W.Va. 512, 527, 466 S.E.2d 171, 186 (1995) (" '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence' "), *quoting Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469, 484 (1993); *State v. Thomas*, 187 W.Va. 686, 691, 421 S.E.2d 227, 232 (1992) ("[c]ross-examination is the engine for truth").

*Id.* Thus, we stated that "only a restrictive application of the Dead Man's Statute is consistent with the liberal thrust of the West Virginia Rules of Evidence. 1 [Franklin D.] Cleckley, [*Handbook on Evidence for West Virginia Lawyers* ] § 1–4(A) at 11 (3rd ed. [1994] ) (the West Virginia Rules of Evidence 'indicate an enhanced confidence in the jury system and the role of the adversarial cross-examination')." *Id.*

With our pronouncements in *Meadows* in mind, we now consider the application of the Dead Man's Statute to medical malpractice cases. We first note that "[i]n a number of instances defendants have been held competent as witnesses in their own behalf in wrongful death actions, on the theory that the applicable dead man act does not apply in actions for wrongful death." H.H. Henry, Annotation, *Competency of Witness in Wrongful Death Action as Affected by Dead Man Statute*, 77 A.L.R.2d 676, § 9[a] at 705 (1961). In addition, "[i]n some states, the statute specifically excepts from its provisions the evidence of persons testifying for themselves in actions for personal injury, death, or damage to property by negligent or tortious acts[.]" 81 Am.Jur.2d *Witnesses* § 576 (1992). Generally, "the dead man's

statute is not looked upon with favor .... [b]ecause the statute is viewed with disfavor courts have attempted to limit the effect of the statute whenever possible." *In the Matter of the Estate of Reist,* 91 Wis.2d 209, 222, 281 N.W.2d 86, 91–92 (1979). However, because Dead Man statutes vary from state to state, we focus our analysis in this case on W.Va.Code § 57–3–1 and W.Va.Code § 55–7B–1, *et seq.,* the West Virginia Medical Professional Liability Act (hereinafter "the MPLA").

As set forth above, W.Va.Code § 57–3–1 refers to actions brought pursuant to chapter 55, article 7, of the West Virginia Code and provides that persons sued for causing the death of any person by wrongful act, neglect or default are permitted to provide evidence in such cases, but may not give any evidence of any conversation with the decedent. *See* note 6, *supra.* Importantly, when this language was added to W.Va.Code § 57–3–1,[7] neither the MPLA, nor W.Va.R.Evid. 601 existed. The MPLA was not created until 1986, when the Legislature recognized the unique nature of medical malpractice actions. W.Va.Code § 55–7B–1 (1986), wherein the Legislature set forth its legislative findings and declaration of purpose for the MPLA, provides:

> [T]he purpose of this enactment [the MPLA] is to provide for a comprehensive resolution of the matters and factors which the Legislature finds must be addressed to accomplish the goals set forth above. In so doing, the Legislature has determined that reforms in the common law and statutory rights of our citizens to compensation for injury and death, in the regulation of rate making and other practices by the liability insurance industry, and in the authority of medical licensing boards to effectively regulate and discipline the health care providers under such board must be enacted together as necessary and mutual ingredients of the appropriate legislative response.

Thus, through the MPLA, the Legislature enacted a number of changes in the common law surrounding personal injury and wrongful death actions as applied to medical mal-practice cases. In particular, the MPLA provides a number of unique pretrial procedures to be followed in such actions, *see* W.Va.Code § 55–7B–6; imposes specific evidentiary requirements regarding the testimony of expert witnesses, *see* W.Va.Code § 55–7B–7; and alters the common law rule regarding joint and several liability of tortfeasors, *see* W.Va.Code § 55–7B–9. Recognizing that medical malpractice cases are unique and have their own set of rules of evidence and of practice and procedure as set forth in the MPLA, we recently held that "[t]he provisions of the Medical Professional Liability Act, W.Va.Code §§ 55–7B–1 to –11 (1986), govern actions falling within its parameters, subject to this Court's power to promulgate rules for all cases and proceedings, including rules of practice and procedure, pursuant to Article VIII, Section 3 of the West Virginia Constitution." Syllabus Point 3, *State ex rel. Weirton Medical Center v. Mazzone,* —— W.Va. ——, —— S.E.2d ——, 2002 WL 1359317, No. 30360 (June 19, 2002).

In light of the distinctive provisions of the MPLA and considering the continually evolving nature of the common law, we believe it is necessary to carve out a narrow exception to the Dead Man's Statute which limits its applicability in medical malpractice cases. Specifically, we believe that no party should be prohibited from offering evidence in a medical malpractice case because of the Dead Man's Statute. Obviously, the focus of a medical malpractice case is the care and treatment of the patient. In the instance where the patient is deceased, it would be patently unfair to exclude evidence of a patient's complaints regarding their symptoms and ailments and their decisions as to what type of treatment they wished to undergo. In some cases, a patient's subjective description of their ailments may be the sole basis for a physician's diagnosis and treatment.

Barring any party's testimony in these circumstances is against "the policy of law to make available all relevant evidence in the quest for truth." *Meadows,* 196 W.Va. at 63, 468 S.E.2d at 316. Moreover, "[j]ustice ordinarily will not prevail where only a part of the available evidence affords the only sup-

---

7. W.Va.Code § 57–3–1 has not been amended since 1937.

port for the judgment rendered." *Id.* We are confident that a jury which has been presented with all the available evidence is capable of sorting out said evidence, making relevant findings, and returning a proper verdict.

 Although the Legislature has modified certain aspects of the common law relating to wrongful death and personal injury through the MPLA, it has never addressed the applicability of the Dead Man's Statute in medical malpractice cases. In *Meadows,* we pointed out that "the West Virginia Supreme Court possesses paramount authority to adopt rules of evidence for trial courts in this State." 196 W.Va. at 59, 468 S.E.2d. at 312. In that regard, Article VIII, Section 3 of the West Virginia Constitution provides that this Court "shall have power to promulgate rules for all cases and proceedings, civil and criminal, for all of the courts of the State relating to writs, warrants, process, practice and procedure, which shall have the force and effect of law." *See also* Syllabus Point 3, *Mazzone, supra.* Accordingly, based on the foregoing, we now hold that W.Va.Code § 57–3–1 does not bar any party in a wrongful death, medical malpractice action from testifying about conversations with the deceased patient.

 Although we have found that the Dead Man's Statute does not apply in medical malpractice actions, we do note that the appellant waived the application of the statute during the trial in this case. In Syllabus Point 1 of *Martin v. Smith*, 190 W.Va. 286, 438 S.E.2d 318 (1993), this Court held that "[t]he Dead Man's Statute does not preclude the beneficiaries of the decedent's estate from testifying and if they testify as to the decedent's transaction, then there is a waiver of the statutory bar as to the other side."

The record reveals that appellant's counsel told the jury during his opening statement that Dr. Ghaphery was going to testify that he told Mr. Hicks about the vena cava filter and that he rejected it. Then, during the appellant's case-in-chief, appellant's counsel called Dr. Ghaphery as a witness and questioned him about his conversations with the

8. According to the record submitted to this Court, the appellant made no effort to have Dr. Ghaphery's testimony about his conversation with the decedent regarding the vena cava filter

decedent. Specifically, appellant's counsel asked Dr. Ghaphery, "Have you ever said before to Mr. Hicks it would not be in his best interest to have a vena cava filter inserted in him?" Dr. Ghaphery responded that "the understanding that I wanted him to have was that it was not my recommendation." The appellant's counsel then said "I want to know what you told him." Later on, the appellant testified that she did not believe that Dr. Ghaphery ever had a conversation with her husband about the vena cava filter because, with the exception of one night and a few hours one day, she was at the hospital with her husband from the time he was admitted until he was discharged.

Clearly, the appellant waived her right to object to Dr. Ghaphery's testimony based on the Dead Man's Statute.[8] We further note that as a practical matter, it is difficult to imagine a wrongful death, medical malpractice case where a plaintiff would not want to question a defendant physician about his conversations with the deceased patient. Thus, based on all of the above, we do not find that the circuit court erred by not applying the Dead Man's Statute in this case.

### E. Summary Judgment

 Finally, the appellant contends that the circuit court erred in granting summary judgment to Wheeling Hospital and dismissing it from the case. In Syllabus Point 1 of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994), this Court stated that "[a] circuit court's entry of summary judgment is reviewed *de novo.*" Pursuant to Rule 56 of the West Virginia Rules of Civil Procedure, summary judgment is required when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In Syllabus Point 3 of *Aetna Casualty & Surety Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963), this Court held: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law."

excluded prior to trial based on the Dead Man's Statute. The issue was only raised in post-trial motions.

The appellant maintains that genuine issues of material fact exist as to whether Wheeling Hospital is vicariously liable for the negligence of Dr. Ghaphery. In support of her contention, the appellant relies upon this Court's decisions in *Thomas v. Raleigh General Hospital*, 178 W.Va. 138, 358 S.E.2d 222 (1987) and *Torrence v. Kusminsky*, 185 W.Va. 734, 408 S.E.2d 684 (1991). In *Thomas*, this Court determined that a hospital may be found vicariously liable for a physician's negligence if the physician is an agent of the hospital. *Thomas*, 178 W.Va. at 141, 358 S.E.2d at 225. In Syllabus Point 1 of *Torrence*, this Court expanded upon *Thomas* and held that:

> Where a hospital makes emergency room treatment available to serve the public as an integral part of its facilities, the hospital is estopped to deny that the physicians and other medical personnel on duty providing treatment are its agents. Regardless of any contractual arrangements with so-called independent contractors, the hospital is liable to the injured patient for acts of malpractice committed in its emergency room, so long as the requisite proximate cause and damages are present.

The appellant contends that her husband was in constant and continuous emergency care while he was at Wheeling Hospital, even during and after his back surgery. The appellant maintains that she was not able to choose the doctors that treated her husband because she was told by Dr. Ghaphery that her husband would probably die if he were transferred to another hospital. The appellant further claims that there is no evidence that Wheeling Hospital did anything that would have led her to believe that Dr. Ghaphery was an independent contractor and not an employee of the hospital. Thus, she asserts that genuine issues of material fact exist as to whether Dr. Ghaphery was an ostensible agent of Wheeling Hospital.

■ The circuit court determined that there was no agency relationship between Dr. Ghaphery and Wheeling Hospital at the time the alleged negligence occurred. After thoroughly reviewing the record in this case, we reach the same conclusion. While it is undisputed that Dr. Ghaphery was the on-call emergency surgeon when Mr. Hicks was brought to Wheeling Hospital on April 12, 1996, there has been no allegation that any acts of negligence occurred while Mr. Hicks was in the emergency room. Instead, the appellant has asserted that Dr. Ghaphery was negligent on April 16, 1996, when he operated on her husband and failed to insert a vena cava filter system in his back. Contrary to the appellant's contentions, we cannot find that an ostensible agency relationship existed between Wheeling Hospital and Dr. Ghaphery at that time.

Moreover, the appellant clearly knew that Mr. Hicks' physicians including Dr. Ghaphery were not employees or agents of the hospital and that she had the right to choose the physician who would care for her husband. When Mr. Hicks was admitted to Wheeling Hospital, the appellant executed a "Consent Upon Admission to Hospital and Medical—Surgical Treatment" form which stated that, "The undersigned recognizes all doctors of medicine furnishing services to the patient, including radiologists, pathologists, anesthesiologists, radiation oncologists, and the like are independent contractors and are not employees or agents of the hospital." Therefore, based on all this evidence, we do not find that the circuit court erred by granting summary judgment in favor of Wheeling Hospital.

## III. CONCLUSION

Accordingly, for the reasons set forth above, the final order of the Circuit Court of Brooke County is affirmed to the extent that it grants summary judgment in favor of Wheeling Hospital. However, since we have found that the circuit court erred by giving a mistake in judgment instruction, the final order is reversed with respect to the appellant's motion for a new trial, and this case is remanded for further proceedings consistent with this opinion.

Affirmed, in part, Reversed, in part, and Remanded.

McGRAW, J., concurring, in part, and dissenting, in part.

(Filed July 3, 2002)

I concur in the majority's decision to grant a new trial in this case, but I dissent to the majority's decision to uphold summary judgment in favor of the hospital. We have held.

in other cases where a hospital has been sued in connection with a doctor's malpractice that, "[w]here a patient goes to a hospital seeking medical services and is forced to rely on the hospital's choice of physician to render those services, the hospital may be found vicariously liable for the physician's negligence." Syl. pt. 2 of *Thomas v. Raleigh General Hospital,* 178 W.Va. 138, 358 S.E.2d 222 (1987). We have also held that:

> Where a hospital makes emergency room treatment available to serve the public as an integral part of its facilities, the hospital is estopped to deny that the physicians and other medical personnel on duty providing treatment are its agents. Regardless of any contractual arrangements with so-called independent contractors, the hospital is liable to the injured patient for acts of malpractice committed in its emergency room, so long as the requisite proximate cause and damages are present.

Syl. pt. 1, *Torrence v. Kusminsky,* 185 W.Va. 734, 408 S.E.2d 684 (1991). In the instant case, the appellant makes the argument that she had no practical options for other medical providers during the time her husband was being treated, other than those provided by the hospital. I believe that the appellant had demonstrated that there existed genuine issues of fact to be tried on this issue, and that inquiry into those facts was desirable to clarify the application of the law. See syl. pt. 3, *Aetna Casualty & Surety Co. v. Federal Ins. Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963). Because I feel the lower court's grant of summary judgment in favor of the hospital was in error, I must respectfully dissent to this aspect of the majority opinion.

STARCHER, Justice, concurring, in part, and dissenting, in part.

(Filed July 9, 2002)

I write to concur with the majority opinion's decision to grant the plaintiff/appellant a new trial, but I dissent to that part of the decision affirming the granting of summary judgment to Wheeling Hospital.

In Syllabus Point 2 of *Thomas v. Raleigh General Hospital,* 178 W.Va. 138, 358 S.E.2d 222 (1987), this Court held that:

> Where a patient goes to a hospital seeking medical services and is forced to rely

on the hospital's choice of physician to render those services, the hospital may be found vicariously liable for the physician's negligence.

In the instant case, Charles Hicks did not choose to go to Wheeling Hospital; he was admitted on an emergency basis, and remained there for his continued treatment. He did not pick and choose his treating physicians, but rather the doctors just showed up on an "as needed" basis and treated his ailments.

These treating physicians were in the Wheeling Hospital, using the hospital's facilities, presumably at the request—or certainly at the sufferance—of the hospital. Normal thinking would suggest that the physicians were "staff" at the hospital. Wheeling Hospital would rather have us believe these physicians were interlopers or trespassers, roaming the halls at will to make money from patients who showed up at the hospital requesting medical services. Any patient— and, had not a summary judgment been granted, any juror—would have believed these physicians were working *for* the hospital, not just *at* the hospital.

This Court has gradually expanded hospital liability for malpractice by doctors practicing in the hospital's facilities using numerous legal theories. Hospitals are vicariously liable for doctors who are directly employed by the hospital. *Thomas v. Raleigh General Hospital,* 178 W.Va. 138, 358 S.E.2d 222 (1987). Agency liability has been imposed upon hospitals for doctors who provide essential or emergency services for the hospital. *Torrence v. Kusminsky,* 185 W.Va. 734, 408 S.E.2d 684 (1991). And hospitals have been found to be directly liable for negligently giving "privileges" or "credentials" to, and thereafter monitoring, its physicians. *See, e.g., Roberts v. Stevens Clinic Hospital, Inc.,* 176 W.Va. 492, 345 S.E.2d 791, 797 (1986) ("Whether the hospital allowed a known incompetent to continue to enjoy hospital privileges was a major point to be decided in determining the hospital's negligence.")

I believe the time has come to dispose of these multiple legal theories for medical malpractice liability. Instead, some other mechanism—either based in statute or in the common law—should be developed to impose liability upon hospitals, rather than the indi-

vidual doctors and nurses who happen to work there. A likely mechanism would be the doctrine of *respondeat superior*, a doctrine which focuses "legal responsibility for personal injury on the enterprise in the best position to make risk/safety tradeoffs[.]" Kenneth S. Abraham and Paul C. Weiler, "Enterprise Medical Liability and the Evolution of the American Health Care System," 108 Harv.L.R. 381, 384 (1994). By making the enterprise or organization liable, the hospital—not the negligent "employee"—would be liable for the malpractice. Doctors would be treated as employees, even if the hospital characterizes them as independent contractors.

The result would be that doctors would not have to be named as individual defendants for malpractice committed in a hospital—or, if they were, the hospital would be responsible for any judgment and the doctor would be sued in name only. Doctors would therefore never need to buy individual malpractice insurance to cover medical services rendered in hospitals.[1] And hospitals are better equipped than doctors to pass along the costs of malpractice insurance to patients, and better equipped to construct systems of overall patient care which will prevent future incidents of malpractice.

If a truck driver[2] causes an accident, we allow a lawsuit against the trucking company that employed the driver because the trucking company is better equipped to spread the cost of the accident, and the trucking company is better positioned to ensure that future truck drivers do not cause similar accidents. The truck driver is not expected to carry insurance, and regardless of the technical legal rights of the trucking company, it simply would not seek indemnity from a negligent truck driver. Why should doctors and hospitals be treated differently?

The current system wastes an enormous amount of resources. The focus is too often on the legal relationships between the defendant doctors, hospitals, nurses and hospital staff workers, and not on the basic question that is at the root of the matter: was the plaintiff injured as a proximate cause of someone's carelessness? Massive amounts of time and money are spent, lots of finger pointing is done, lots of egos and friendships are bruised, and all too often the doctor is left holding the bag. Doctors must spend thousands of dollars buying malpractice insurance to protect against claims which would be much more efficiently covered by one, hospital-bought policy.

I concur in the majority opinion's decision to send this case back for trial—but I would have also included the defendant hospital in that trial. I therefore respectfully dissent.

---

1. Remarkably, it appears that doctors have, in the past, lobbied against a system that would impose liability upon hospitals:

 Practicing physicians, while pleased with the idea of getting the lawyers off their backs, worried that this reform would simply put hospital administrators in the lawyers' place. Throughout the summer of 1993, organized medicine pleaded with the government— "don't take our malpractice liability away from us."

 Paul C. Weiler, "Fixing the Tail: The Place of Malpractice in Health Care Reform," 47 Rutgers L.Rev. 1157, 1192 (1995).

2. "Truck driver" was an avocation chosen at random. Other professions work just as well—a pilot working for an airline, a chemical engineer working for a chemical company, etc.