IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

SEPTEMBER 2021 TERM

FILED
November 19, 2021
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 21-0404

STATE OF WEST VIRGINIA, EX REL.
SCOTT R. SMITH, PROSECUTING ATTORNEY, OHIO COUNTY
Petitioner

V.

THE HONORABLE MICHAEL J. OLEJASZ,
JUDGE OF THE CIRCUIT COURT OF
OHIO COUNTY, WEST VIRGINIA, AND
CHANDIS WESLEY LINKINOGGER, DEFENDANT
Respondents

_____

PETITION FOR WRIT OF PROHIBITION

WRIT GRANTED

_____

Submitted: October 26, 2021
Filed: November 19, 2021

Gail W. Kahle                          Gerasimos (Jerry) Sklavounakis
Assistant Prosecuting Attorney          Sklavounakis Law Offices
for Ohio County, West Virginia          Wheeling, West Virginia
Wheeling, West Virginia                 Attorney for Respondent,
Attorney for Petitioner                 Chandis Wesley Linkinogger

CHIEF JUSTICE JENKINS delivered the Opinion of the Court.

**JUSTICE WOOTON concurs and reserves the right to file a separate opinion.**

**SYLLABUS BY THE COURT**

1.      "The State may seek a writ of prohibition in this Court in a criminal case where the trial court has exceeded or acted outside of its jurisdiction.  Where the State claims that the trial court abused its legitimate powers, the State must demonstrate that the court's action was so flagrant that it was deprived of its right to prosecute the case or deprived of a valid conviction.  In any event, the prohibition proceeding must offend neither the Double Jeopardy Clause nor the defendant's right to a speedy trial.  Furthermore, the application for a writ of prohibition must be promptly presented."  Syllabus point 5, *State v. Lewis*, 188 W. Va. 85, 422 S.E.2d 807 (1992), *superseded by statute on other grounds as recognized by State v. Butler*, 239 W. Va. 168, 799 S.E.2d 718 (2017).

2.      "A writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court.  It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers.  W. Va. Code 53-1-1."  Syllabus point 2, *State ex rel. Peacher v. Sencindiver*, 160 W. Va. 314, 233 S.E.2d 425 (1977).

3.      "In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not

i

correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight." Syllabus point 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1997).

**Jenkins, Chief Justice:**

Petitioner Scott R. Smith, Prosecuting Attorney for Ohio County ("the State"), invokes this Court's original jurisdiction, and petitions this Court to issue a writ of prohibition against the respondent, the Honorable Michael J. Olejasz, Judge of the Circuit Court of Wood County ("circuit court"), prohibiting the circuit court from enforcing the April 22, 2021 order dismissing two counts of the indictment in the underlying criminal case, declaring a mistrial, and ruling that the subject matter of the dismissed counts could not be mentioned at any future trial on the remaining counts. Below, the circuit court granted a motion to dismiss orally raised by respondent and defendant below, Chandis Wesley Linkinogger ("Mr. Linkinogger"), after he alleged that the State violated various discovery orders. In granting the motion to dismiss, two counts of sexual assault in the second degree were dismissed with prejudice.

Having considered the briefs submitted on appeal, the appendix record, the parties' oral arguments, and the applicable legal authority, we conclude that the circuit court failed to properly analyze the necessary factors for sanctions against the State pursuant to our holding in *State ex rel. Rusen v. Hill*, 193 W. Va. 133, 454 S.E.2d 427 (1996). Accordingly, and for the reasons set forth below, we grant the requested writ of prohibition and prohibit the enforcement of the April 22, 2021 order that dismissed two counts of sexual assault in the second degree with prejudice.

1

# I.

## FACTUAL AND PROCEDURAL HISTORY

Mr. Linkinogger was indicted by a grand jury in January of 2021 for the crimes of strangulation, burglary, and two counts of sexual assault in the second degree. The indictment stated that on or about September 11, 2020, in Wheeling, West Virginia, Mr. Linkinogger forcibly entered into the victim's home and strangled her as he sexually assaulted her. The victim then presented to Wheeling Hospital where a Sex Crime Kit was collected.

At the arraignment in January of 2021, the State tendered its discovery disclosure which contained the following: (1) identity of two treating physicians from Wheeling Hospital as expert witnesses; (2) notes taken by the nurse during the completion of the Sex Crime Kit; and (3) results of a urine toxicology screen (completed at Wheeling Hospital) from the victim showing positive results for cocaine, THC, and benzodiazepines. The discovery disclosure did not include any witness, lay or expert, identified by the State from the West Virginia State Police Forensic Laboratory ("Forensic Lab"). The State contends that it never needed a Forensic Lab witness because on September 11, 2020, after being advised of his *Miranda* rights, Mr. Linkinogger gave an extended interview to a detective in which he admitted to having sexual relations with the victim. However, Mr. Linkinogger claimed that the sexual relations were consensual.

On February 23, 2021, Mr. Linkinogger filed a motion to compel seeking various categories of evidence and accusing the State of running afoul of its duty to provide exculpatory evidence in accordance with Rule 32.02(a) of the West Virginia Trial Court Rules.[1] Among the items sought was the Forensic Lab results from its testing the materials collected at Wheeling Hospital. On March 9, the State filed a response to the motion to compel in which it indicated—with regard to the Forensic Lab results—that "[t]he results of all examinations and tests performed have been provided to [Mr. Linkinogger]."

Then, on March 12, the parties came together for a hearing on the motion to compel. First, counsel for Mr. Linkinogger argued that the State was withholding the "results of examinations and the tests that have been performed." In response, the State declared that while certain examination tests were disclosed, it was unsure if the materials of the Sex Crime Kit were ever sent to the Forensic Lab or tested because it had no intention of using any of the results at trial:

> MR. KAHLE: I don't believe it was even sent to Charleston. It's probably down there. We – when this case – that was collected, as it generally is, by a S.A.N.E. nurse at the

---

[1] Rule 32.02(a) of the West Virginia Trial Court Rules provides:

> In all criminal cases, the attorney for the State shall advise the attorney for the defendant and provide evidence favorable to the defendant on the issue of the defendant's guilt or punishment without regard to materiality, within the scope of *Brady v. Maryland*, 373 U.S. 83 (1963), including the existence and substance of any payments, promises of immunity, leniency, preferential treatment, or other inducements made to prospective witnesses, within the scope of *United States v. Giglio*, 405 U.S. 150 (1972).

Wheeling Hospital. I don't intend to – if it was sent for testing, I don't intend to use said results. You'll see in the State's disclosure there are not lab technicians indicated or examiners. I don't have any results. If it – it's been sent to Charleston. I've not been on their rear-end to get it done because we aren't in possession – what I believe – it's not been tested by the Court yet, but what I believe is a pretty rock solid statement of [Mr. Linkinogger] admitting that there was lots of sexual contact as between the defendant and [the victim] on September 11th.

So it's true, there are certain examination tests which have been disclosed, and, in particular, that'd be the hospital and treatment records. But there is no – we don't have it.

. . .

And I don't intend to introduce it at trial.

The parties then went off the record to determine whether the Sex Crime Kit was ever sent to the Forensic Lab and if so, whether results exist.

MR. KAHLE: It has been sent. He doesn't know the answer to that question. I'm going to ask him to advise the Court, myself, and Mr. Lantz by the end of today. But I have not seen any need for them to be – for it to be rushed. . . . I didn't do that in this case because of the admissions made on September 11, 2020.

Upon learning that the Sex Crime Kit was sent, the circuit court ordered that the "evidence be rushed by the West Virginia State Police Crime Lab." Additionally, a true copy of the lab report, dated February 22, 2021, was obtained, and was provided to Mr. Linkinogger's counsel in open court. A review of the report indicates that trace amounts of male DNA was found on the two swab samples submitted. The report also suggests that no PCR DNA (identifying DNA) analysis had been performed. Thus, the report suggested that "DNA testing results will be the subject of a separate report." At the time, there were no known

4

samples of Mr. Linkinogger's DNA or of any other person with which to compare DNA results.

Thereafter, on March 17, at 10:29 a.m., counsel for the State received an email containing a "Motion for Order to Rush Toxicology/Lab Reports" and a "Proposed Order" granting the requested relief. In the motion, Mr. Linkinogger sought the toxicology results from the Sex Crime Kit collected at Wheeling Hospital on September 11, 2020, and submitted to the Forensic Lab. Within a half hour of receiving the email, a court assistant emailed counsel for the State and asked if there were any objections to the proposed order. Eighteen minutes later, at 11:18 a.m., counsel responded and stated that it could not take a position yet—it needed to make inquiry of the Forensic Lab's ability to comply with the order. The State's email to the court assistant stated:

> Be advised that I have a call to the WVSP Toxicology Chief, Erin Fisell [*sic*] regarding the request to get their position. Additionally, Defendant is in possession of the toxicology screen from Wheeling Hospital, and I will be filing a Motion in Limine to be heard on the April 2, 2021, pre-trial to preclude evidence of drug abuse from the trial. Thank you.

At 11:49 a.m., counsel for the State received an email from the court assistant which contained the proposed order which had been entered by the court. The order was concise and referred only to compelling "Toxicology and any remaining lab result."

5

The next day, on March 18, the State conversed via email with the Forensic Lab's Toxicology Chief, Erin Feazell. During the conversation, the Forensic Lab noted that it was unable to comply with the order as the only specimen submitted was urine:

> Mr. Kahle, I am in receipt of a court order in case 21-F-4 MJO from the Defendant Chandis Linkinogger's attorney Herman D. Lantz (see attached). The order requests expedited testing on the Toxicology samples that were submitted to the lab. The only specimen submitted in the case was urine. Currently our laboratory is not performing testing on urine. With your permission, I can terminate the testing on this case and return the Toxicology kit to the investigation officer so you can determine whether to send the samples to a private laboratory for testing. Please feel free to contact me if you have any questions.

Because of the Forensic Lab's inability to comply with the proposed order, and in an effort to avoid additional allegations of evidence hiding and discovery violations, the State requested, and was granted, an emergency hearing for that same afternoon.

During the virtual hearing, it became clear that the Forensic Lab was unable to test the urine sample, and, therefore, was unable to comply with the order "rushing lab results." The State acknowledged that upon learning of the Forensic Lab's inability to comply, it immediately acted, and sought guidance from the court on how to proceed:

> MR. KAHLE: I immediately notified everybody of the fact that the State Police could not comply with the Court's Order. I asked her to put that in writing. I then forwarded that e-mail onto everybody, which started, then, a series of e-mails. I first asked for that urine to be sent back – for it to be held onto, and to go wherever it needed to go. Um – the response was that they don't do that. What they do – and this must be State Police guidelines, Judge – will return it to the requesting police agency. With that, Judge, I said, "Can we overnight it to the

6

requesting police agency?" Um – they're requiring a case closure form – and I think all the other testings been done – they are requiring a case closure form, and they can't get it back here until Monday.

Given the fact that we're running – the State Police is potentially running afoul of the Court's Order – I felt that whatever – I don't want to be caught in a "got you", Judge. I wanted some guidance from the Court as to where to go from here.

After hearing testimony from both parties, the Court made a determination:

THE COURT: Very good. Then how we'll proceed then is, Mr. Kahle, please contact Miss Feazell, or whoever – "Fee-zell" – request that they return Item 2, the toxicology sample to the sending agency – the Wheeling Police Department – because they can't test it. And then, once the Wheeling Police Department has it back and in their safe possession – um – if the parties want to put a draft Order to the Court, to release it to the defense for testing, we can do that.

If there is an issue where they will not release it, for whatever reason, and the parties want to put another Order before the Court, I would be happy to – I'm not going to be in tomorrow, but I'll be happy to stop by and review it and sign it, if it does become a problem.

Also, Mr. Lantz, *after you've been able to have a meaningful conversation with your client regarding these – these issues, please inform Mr. Kahle as to your position with regard to possible DNA sampling from your client and – um – the Court will, again, execute any necessary orders.*

(Emphasis added). From the testimony provided, two things became ultimately clear:

(1) the Lab could not run toxicology on the urine sample, and thus it would be returned to

the Wheeling Police for testing at another lab of Mr. Linkinogger's choosing; and (2) issues

of PCR DNA testing would be deferred pending a discussion between Mr. Linkinogger

and his counsel. Subsequent to the hearing, the urine was sent to a lab in Pennsylvania for

7

toxicology testing; however, the record does not indicate that counsel for Mr. Linkinogger ever expressed a desire for PCR DNA testing after the March 18 emergency hearing.

On April 13, 2021, the first day of trial began by seating a jury. A jury was seated and sworn in during the first day. The next day, during the second day of trial, the parties met for a hearing in chambers. Counsel for Mr. Linkinogger made an oral motion for complete dismissal of charges. In the oral motion, counsel for Mr. Linkinogger made allegations of discovery violations and argued that the State acted in bad faith in failing to ensure that the PCR DNA testing was completed—which he claimed might somehow expose evidence tending to exculpate Mr. Linkinogger. He also argued that toxicology results would have yielded results showing the level of the victim's intoxication, thus showing the victim's pain threshold/lowered inhibitions which was consistent with the defense theory of consent.

The State argued that PCR DNA testing was never requested by Mr. Linkinogger, and that without his own sample, the results would be irrelevant and incomparable. The State further contended that if Mr. Linkinogger felt that such evidence was needed for the defense, then a continuance to allow for such testing would be the appropriate remedy. Further, the State noted that the toxicology report from Wheeling Hospital that showed that the victim's urine contained cocaine, THC, and benzodiazepines had already been provided to the defense. The State also reminded the circuit court that

8

after the March 18 hearing, the urine sample had been sent to a laboratory chosen by the defense.

During this meeting in chambers, the circuit court orally ruled that the State and the Forensic Lab violated the March 17 order compelling test results, and the January 21 scheduling order, and thereby dismissed with prejudice, counts three and four (sexual assault in the second degree) of the indictment. In addition, the circuit court also declared a mistrial with regard to the strangulation and burglary counts and made a ruling that any and all references to counts three and four were prohibited at any rescheduled trial. This decision was memorialized in the April 22, 2021 order. This petition for writ of prohibition followed.

## II.

## STANDARD FOR ISSUANCE OF WRIT

This Court has previously found that there are limited circumstances in which the State may request a writ of prohibition in a criminal matter. We held in Syllabus point five of *State v. Lewis*, 188 W. Va. 85, 422 S.E.2d 807 (1992), *superseded by statute on other grounds as recognized by State v. Butler*, 239 W. Va. 168, 799 S.E.2d 718 (2017), that

> [t]he State may seek a writ of prohibition in this Court in a criminal case where the trial court has exceeded or acted outside of its jurisdiction. Where the State claims that the trial court abused its legitimate powers, the State must demonstrate

9

that the court's action was so flagrant that it was deprived of its right to prosecute the case or deprived of a valid conviction. In any event, the prohibition proceeding must offend neither the Double Jeopardy Clause nor the defendant's right to a speedy trial. Furthermore, the application for a writ of prohibition must be promptly presented.

*Accord State ex rel. State v. Sims*, 239 W. Va. 764, 767, 806 S.E.2d 420, 423 (2017).

Furthermore, in Syllabus point 2 of *State ex rel. Peacher v. Sencindiver*, 160 W. Va. 314, 233 S.E.2d 425 (1977), we held that "[a] writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court. It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. W. Va. Code, 53-1-1." This Court will grant writs of prohibition

to correct only substantial, clear-cut, legal errors plainly in contravention of a clear statutory, constitutional, or common law mandate which may be resolved independently of any disputed facts and only in cases where there is a high probability that the trial will be completely reversed if the error is not corrected in advance.

Syl. pt. 1, in part, *Hinkle v. Black*, 164 W. Va. 112, 262 S.E.2d 744 (1979), *superseded by statute on other grounds as stated in State ex rel. Thornhill Grp., Inc. v. King*, 233 W. Va. 564, 759 S.E.2d 795 (2014).

Moreover,

[i]n determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate

10

means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syl. pt. 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1997). With these standards in mind, we now examine the State's request for a writ of prohibition.

## III.

## DISCUSSION

At issue in the case sub judice is the ruling of the circuit court dismissing, with prejudice, two counts of sexual assault in the second degree as a sanction for alleged discovery violations. In ruling as such, the circuit court's order not only dismissed two counts of the indictment, but also declared a mistrial with regard to the other two counts: strangulation and burglary. The State maintains that the circuit court abused its discretion and "wrongfully deprived the State [of] its right to prosecute Mr. Linkinogger for serious felony allegations" when it dismissed the indictment as a discovery sanction.

11

Mr. Linkinogger rebuts the arguments of the State and argues that the circuit court properly dismissed the two sexual assaults counts because the State failed to produce evidence crucial to the resolution of the case. Moreover, he contends that the State is not entitled to a writ of prohibition because (1) the circuit court's order was not so flagrant as to deprive the State of its right to prosecute the underlying criminal case; and (2) granting the writ of prohibition would violate his rights against double jeopardy.[2]

---

[2] In his brief, Mr. Linkinogger contends that granting a writ of prohibition would violate his rights against double jeopardy. To support this contention, Mr. Linkinogger states that he was placed on trial on a valid indictment before a court of competent jurisdiction, and a jury was impaneled and sworn. Therefore, because of this, his rights against double jeopardy are at issue.

Because this case is a case of original jurisdiction, the State was unable to file a reply brief. As such, during oral argument, the State addressed and provided its rebuttal to this argument. While the State acknowledged that the jury was indeed impaneled and sworn, it maintains that Mr. Linkinogger's double jeopardy rights are not triggered in this matter because double jeopardy is only triggered when the action taken is equated to an acquittal, not whether the action is titled or characterized as an acquittal. We agree. In *State v. Adkins*, this Court stated:

> In the case presently before us Adkins was indicted as the "sole perpetrator" of the crime of murdering Idona Baker, i.e., as a principal in the first degree. The evidence, viewed in the light most favorable to the State, however, showed only that Adkins had aided and abetted Mooney in the commission of the crime. Under *State v. Bennet*, [157 W. Va. 702, 203 S.E.2d 699 (1974)] Adkins was therefore entitled to a directed verdict of acquittal due to a variance between pleading and proof. The mere designation of that order as an "acquittal," however, does not in and of itself bar a retrial of the defendant. As noted in footnote 15 of *State ex rel. Watson v. Ferguson*, [166 W. Va. 337, 274 S.E.2d 440 (1980)] "The critical question is under what circumstances the first trial aborted and in particular whether it was aborted by reason of prosecutorial or judicial 'bad faith,' including evidentiary insufficiency." 166 W. Va. at 347, 274 S.E.2d at 445. In the case before us the "acquittal"

12

The two counts of sexual assault in the indictment against Mr. Linkinogger were dismissed as a sanction for the State's alleged noncompliance with two court orders: (1) the January 21, 2021 scheduling order; and (2) the March 17, 2021 *ex parte* order rushing "Toxicology and any remaining lab results in this matter." The State first contends that no discovery violations actually existed. To support this contention, the State avers that its discovery disclosure was provided two weeks before the deadline and contained "all the Rule 16 discovery that existed at that time." The scheduling order stated that February 4, 2021 was the State's discovery deadline. The Forensic Lab report at issue was not authored until February 22, 2021, and was provided to defense counsel in open court at the March 12 hearing—a full month before the scheduled trial date. Moreover, with regard to the March 17 order to compel, the State asserts that the order was entered without a hearing, and without the sufficient time necessary for meaningful communication with the Forensic Lab. It was not until after the order was entered, that

> did not arise from any evidentiary insufficiency or any other prosecutorial or judicial "bad faith." *Id.* Similarly, the "acquittal" in this case was not based upon "a resolution . . . of some or all of the factual elements of the offense charged." *United States v. Martin Linen Supply Co.*, [430 U.S. 564, 571, 97 S.Ct. 1349, 1354-1355, 51 L.Ed2d 642, 651 (1977).] We are therefore of the opinion that double jeopardy does not bar a retrial of the defendant upon an indictment charging him as an aider and abettor in the murder of Idona Baker.

*State v. Adkins*, 170 W. Va. 46, 51, 289 S.E.2d 720, 724-25 (1982).

In the case sub judice, although the Circuit Court dismissed the two counts of sexual assault, it cannot be equated as an acquittal. Rather, the dismissal was procedural in nature, and therefore Mr. Linkinogger's rights against double jeopardy are not triggered.

13

the State learned from the Toxicology Chief that the Forensic Lab did not perform toxicology on urine samples, and therefore the urine would be returned for testing at a private laboratory, if requested by Mr. Linkinogger. Therefore, because the State complied in good faith with both of the orders, the State submits that no discovery violations exist. However, even if discovery violations did exist in the present matter, the State argues that the remedy imposed—complete dismissal of violent felonies—did not comport with the alleged discovery violations and was an inappropriate sanction. We agree.

To begin our analysis, we begin with some general observations. Rule 16(d)(2) of the West Virginia Rules of Criminal Procedure states that

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. The court may specify the time, place and manner of making the discovery and inspection and may prescribe such terms and conditions as are just.

As this Court stated in *State ex rel. Rusen v. Hill*, 193 W. Va. 133, 454 S.E.2d 427 (1994), "[w]e believe that it is necessary in most criminal cases for the State to share its information with the defendant if a fair trial is to result. Furthermore, we find that complete and reasonable discovery is normally in the best interest of the public." *Id.* at 139, 454 S.E.2d at 433. Rule 16 of the West Virginia Rules of Criminal Procedure does not a provide a

14

bright-line rule for courts to use when dealing with discovery violations. While Rule 16 contains some examples of potential sanctions, the rule also includes a vague phrase giving circuit courts broad latitude: *may enter such other order as it deems just under the circumstances*.

When reviewing whether a circuit court erred in imposing such a severe sanction as complete dismissal, we are guided by this Court's prior decision in *State ex rel. Rusen v. Hill*, 193 W. Va. 133, 454 S.E.2d 427 (1994). In *Rusen*, this Court concluded that "[t]he scope of appellate review must necessarily be an abuse of discretion standard." *Id.* at 140, 454 S.E.2d at 434. In making this determination, the *Rusen* Court examined the range of remedies found in Rule 16 of the West Virginia Rules of Criminal Procedure and noted that circuit courts are given broad latitude. However, the Court also identified a need for clarification and guidance:

> This broad language justifies the adding of several other remedies or sanctions to the list such as (a) advising the jury to assume the existence of facts that might have been established by the missing information, (b) holding the violator in contempt of court, (c) granting a mistrial, and (d) dismissing the charges. We specifically hold that one of the permissible sanctions under Rule 16(d)(2) for a discovery violation is a dismissal with prejudice.

*Id.* The *Rusen* Court continued, and found that determining

> [w]hich remedy is preferable is best left to the discretion of the circuit court. Such rulings will not be reversed unless there is an abuse of discretion. The circuit court must have discretion

15

to fashion a remedy for noncompliance that encompasses "a fair balancing of the interests of the courts, the public, and the parties[,]" recognizing that the dismissal of cases with prejudice is a remedy which should be used only in the most egregious cases. *People v. Taylor*, 159 Mich.App. 468, 487, 406 N.W.2d 859, 869 (1987).

*Id.* Next, the Court set forth several factors that must be examined when analyzing whether an abuse of discretion occurred. Those factors include, but are not limited to:

> (a) the importance and materiality of the information that was not disclosed;
>
> (b) the ability of the party to try the case without the information or the nature of the prejudice claimed by the failure to comply with the discovery order;
>
> (c) the extent to which a continuance or other lesser relief would delay the trial or otherwise impact adversely the administration of justice;
>
> (d) the degree of negligence involved and the explanation of the party's failure to comply with a discovery request;
>
> (e) the effort made by the party to comply with the discovery order;
>
> (f) the number of times the circuit court ordered the party to comply with the discovery order; and
>
> (g) in some cases, the severity of the offense.

*Id.* Finally, the *Rusen* Court concluded, and elaborated on the role of the circuit court when utilizing the aforementioned factors:

> Further expansion of these factors is necessary. Once a circuit court receives a motion requesting sanctions or relief for discovery violations, the circuit court should order, to the full extent required by the discovery rules or the court order, an immediate disclosure. The relief that is appropriate initially will depend to a large degree on the reason disclosure was not

16

timely made and the prejudice resulting from the failure to provide timely discovery. Similarly, the circuit court should review the frequency and force of the defendant's objections or motions as opposed to attaching significant weight to a pure pro forma protest. *The preferred relief where the party responsible for the violation has not acted in bad faith is to grant the defendant a continuance giving him or her an opportunity to prepare for trial once the discovery materials have been made available. Thus, where the violation relates to discovery of potential trial evidence, the circuit court is advised to grant a continuance sufficient in duration to permit the defendant to obtain that evidence and to prepare for trial.*

*Id.* at 140-41, 454 S.E.2d at 434-35 (emphasis added).

This Court's decision in *Rusen* was elaborated upon in *State ex rel. Plants v. Webster*, 232 W. Va. 700, 753 S.E.2d 753 (2012) (per curiam). In *Plants*, this Court issued a writ of prohibition prohibiting the enforcement of a circuit court's order that excluded evidence from trial as a discovery sanction. *Id.* at 708, 753 S.E.2d at 761. When faced with the record before it, the *Plants* Court analyzed the circuit court's ruling under the *Rusen* factors and found that the State did not act in bad faith in its dealings with the subject evidence. *Id.* at 707, 753 S.E.2d at 760. Rather, the Court maintained that the conduct at issue "was unintentional, and that the State made a reasonable effort to comply with [the respondent's] discovery requests." *Id.* Thus, in an effort to correct the abuse of discretion below, the *Plants* Court granted the writ of prohibition because "[w]ithout this writ, the State, who has no right to appeal a criminal conviction, may otherwise be without a remedy to correct this legal error." *Id.* at 708, 753 S.E.2d at 761.

17

In the case *sub judice*, on the second day of trial, the parties met in chambers—away from the jury—to discuss the alleged discovery violations committed by the State. In response to these allegations, the State once again denied that said violations occurred, and requested that, "if this is so important to [Mr. Linkinogger], that the remedy would be a continuance to get PCR testing done. . . . The results or the remedy should not be a dismissal for an adverse inference, but rather a continuance to get these testing results done." Conversely, counsel for Mr. Linkinogger made an oral motion to dismiss the two counts of sexual assault because of the State's failure to comply with the court's prior orders. The circuit court ultimately agreed with Mr. Linkinogger and granted the motion. Most significant, in granting the motion to dismiss the two counts of sexual assault in the indictment with prejudice, the circuit court cited *no* legal authority and gave *no* reasoning for its action beyond stating that "the State violated two Court Orders by not producing evidence crucial to the resolution of this case."

The circuit court's order granting Mr. Linkinogger's motion to dismiss the sexual assault counts from the indictment does not contain any analysis of Rule 16 or the *Rusen* factors—a "necessary analysis." *See, e.g.*, *Plants*, 232 W. Va. 700, 706, 753 S.E.2d 753, 759 ("The lower court's order granting [respondent's] motion to suppress the shell casings and other evidence does not contain this "necessary analysis."). Because of this omission, we are then left to analyze the circuit court's ruling using the *Rusen* factors as our guide, based on the limited record before us.

18

The transcript from the March 12 hearing shows that during a recess, it was confirmed that the Sex Crime Kit *was* sent to the Forensic Lab. During that same hearing, a copy of the lab report was provided to Mr. Linkinogger's counsel in open court. While the report showed evidence of male DNA on various parts of the victim's body, the report was clear that no PCR DNA analysis was completed—"DNA testing results will be the subject of a separate report." A few days later, on March 17, the State received an email with an attached proposed order compelling lab and toxicology results. Within minutes, the State acted and contacted the Forensic Lab to see if toxicology tests were ever performed on the urine sample. Before the Forensic Lab could respond, the circuit court entered the order. The next day, the Forensic Lab notified the State that it *does not perform testing on urine*. As such, the Forensic Lab offered to return the urine so that further testing could be completed at a private lab if Mr. Linkinogger so requested.

Within hours of learning that it could not comply with the entered order, and in a clear effort to avoid any hint of impropriety, the State asked for an emergency hearing. The transcript of this hearing—the March 18 virtual hearing—indicates that Mr. Linkinogger's counsel was "more interested in the toxicology results than . . . those DNA results." Counsel for Mr. Linkinogger indicated that he wanted toxicology on the urine sample because it could show the victim's level of impairment, which would assist in the defense's theory of consent. Counsel also confirmed that he was aware that he needed to verify whether Mr. Linkinogger wished to have PCR DNA testing performed: "I need to discuss with Mr. Linkinogger whether or not he desires to have the remaining testing done.

19

. . . That's a conversation that I need to have with him." This also needed to be confirmed, so that Mr. Linkinogger could provide a sample of his own DNA for comparison and analysis. From our review of the record, there is nothing to suggest that Mr. Linkinogger ever requested the PCR DNA testing after the March 18 hearing.

More troubling, are defense counsel's apparent misrepresentations to the circuit court during the second day of trial on April 13, 2021. On March 22, 2021, Erin Feazell of the Forensic Lab sent an email to defense counsel in which she answered various inquiries and documented questions that they had discussed earlier that day:

> Would someone be able to testify to impairment based on levels of drugs found in the urine? If we tested the sample, we would not be able to testify to impairment. I am unsure whether or not a toxicologist from a private lab would be able to do this. Typically toxicologists can't testify to impairment just based on a number from a lab result. Generally, additional information needs to be provided in order to form these types of opinions. You would have to contact the lab directly to see if they would be able to provide this type of testimony.

However, despite receiving this response from the Forensic Lab—which clearly establishes that it *cannot testify to impairment*, defense counsel represented to the court on April 13, that had the Forensic Lab done toxicology testing on the urine, there would have been evidence to "determine what was happening at the time [of the alleged assault], [the victim's] inhibitions and willingness to engage in activity that she may not otherwise be willing to engage in."

20

From the appendix record, it does not appear that the State negligently or in bad faith violated the orders of the circuit court regarding the testing of evidence. Rather, the record illustrates the diligent steps taken by the State to ensure its compliance with the orders of the court (i.e. requesting an emergency hearing for guidance, continued communication with the Forensic Lab, etc.). Additionally, we would be remiss to ignore the behavior of defense counsel—which from the record—appears to have taken some aspects of this matter out of context in an effort to confuse or obfuscate the facts in this case. Based on our review of the appendix record as a whole, and keeping the *Rusen* factors in mind, multiple details have become clear: (1) the State made it known early on that it did not intend to call any witness from the Forensic Lab; (2) Mr. Linkinogger admitted to police that he had lots of sexual interactions with the victim the night of the attack; (3) because of Mr. Linkinogger's admission, the State would not need DNA evidence to prove that Mr. Linkinogger was the individual who had sexual relations with the victim; (4) within hours of the March 17 order to compel being entered, the State took precautionary action to avoid running afoul of the circuit court's order when it asked for an emergency hearing on March 18; (5) the Forensic Lab does not run toxicology tests on urine; (6) all parties knew, or became aware that the Forensic Lab did not test the urine by the March 18 emergency hearing and the parties agreed to send the urine to a laboratory chosen by the defense for further testing; (7) on March 18, Mr. Linkinogger knew that if he wanted PCR DNA testing completed, he needed to make his wishes known so that evidence could be sent to a private laboratory; (8) by the time trial began on April 12, defense counsel knew that toxicology results on the urine would not indicate the victim's

21

level of impairment, yet counsel represented to the circuit court that he needed those results to support his theory of consent and the victim's inhibitions; and (9) there was no bad faith or intentional action on the part of the State.

When deciding what sanctions to impose for discovery violations, "our preference remains for trial courts to grant continuances in most cases." *Plants*, 232 W. Va. 700, 707, 753 S.E.2d 753, 760.

> The relief that is appropriate initially will depend to a large degree on the reason disclosure was not timely made and the prejudice resulting from the failure to provide timely discovery. Similarly, the circuit court should review the frequency and force of the defendants' objections or motions as opposed to attaching significant weight to a pure *pro forma* protest. The preferred relief where the party responsible for the violation has not acted in bad faith is to grant the defendant a continuance giving him or her an opportunity to prepare for trial once the discovery materials have been made available. Thus, where the violation relates to discovery of potential trial evidence, the circuit court is advised to grant a continuance sufficient in duration to permit the defendant to obtain that evidence and to prepare for trial.

> Our cases and the West Virginia Rules of Evidence have declared an implicit preference for a continuance when there has been a discovery violation. *See* W. Va. R. Evid. 403 ("unfair surprise" is not listed as a ground for exclusion). *See State v. Barker*, 169 W. Va. 620, 623, 289 S.E.2d 207, 210 (1982) ("[e]ven if this were a 'proper' case in which to claim surprise, the appellant failed to move for a continuance, and, therefore, waived his right to one"); *Martin v. Smith*, 190 W. Va. 286, 291, 438 S.E.2d 318, 323 (1993) ("even given that the admission of Dr. Adams' testimony prejudiced Dr. Smith's case, we find such prejudice far from

22

incurable. Dr. Smith could have easily moved for a continuance in order to secure a comparable expert witness").

*Rusen*, 193 W. Va. 133, 140-41, 454 S.E.2d 427, 434-35. However, we also recognize that there are some circumstances where a continuance is not appropriate.

> If a continuance will cause too great a disruption in the trial process, or if a continuance will not dissipate the prejudice caused by the nondisclosure, a circuit court should consider stronger measures such as dismissal. Sanctions generally should not have "adverse effects on the rights of the parties"; a dismissal with prejudice necessarily has a substantial effect on the interest of the community and the party represented by the prosecution.

*Id.* at 141, 454 S.E.2d 427 at 435. As such, "the sanction of dismissal should be used sparingly and only when the prosecution has been derelict in its effort to comply with discovery orders." *Id.*

Applying the factors that we have discussed to the instant case, we conclude that the circuit court abused its discretion when it dismissed the two counts of sexual assault with prejudice as a sanction for alleged discovery violations on behalf of the State. We find that the State acted in good faith in its dealings with the forensic evidence in this matter and took proper, appropriate precautions to ensure that it abided by the discovery orders imposed by the court. The State put forth the effort to comply with the orders at issue, which is evidenced by the email communications with the Forensic Lab, and the timely request for the emergency hearing. Any alleged discovery violation or delay that may have occurred was unintentional, and there is nothing to indicate that a continuance—instead of

23

a dismissal—would have disrupted or prejudiced Mr. Linkinogger's case. At the time of the dismissal, there had been no continuances, and the record failed to show that the presence of PCR DNA analysis or urine toxicology would have had a significant impact on the case. As such, this examination illustrates that the circuit court exceeded its discretion in issuing such a severe sanction, and we find that the State has sufficiently demonstrated "that the court's action was so flagrant that it was deprived of its right to prosecute the case."

## IV.

## CONCLUSION

For the reasons set forth above, we conclude that the Circuit Court of Ohio County abused its discretion and committed clear legal error in dismissing the two counts of sexual assault in the second degree as a discovery sanction. As such, we find that the State is entitled to a writ of prohibition prohibiting the circuit court from enforcing the April 22, 2021 order dismissing two counts of the indictment in the underlying criminal case, declaring a mistrial, and ruling that the subject matter of the dismissed counts could not be mentioned at any future trial on the remaining counts. We vacate the April 22, 2021 ruling of the Circuit Court of Ohio County and we further direct that the mandate of this Court be issued forthwith.

Writ granted.

24